## THE VALLEY SAVINGS BANK OF MIDDLETOWN, FREDERICK COUNTY *vs.* CHARLES E. MERCER ET AL.

*Release of One of Several Joint Debtors—Who is Holder in Good Faith of Promissory Note—Note Obtained by Fraud and Negotiated Before Maturity to Bank—Instructions to Jury—Insufficient Evidence to Show Bad Faith of Holder.*

A release, not under seal, of one of two or more joint debtors, all being principals, does not discharge the other debtors.

The agent of the owner sold a worthless Spanish jackass and obtained from the purchasers a promissory note payable to the seller. The note was in fact obtained by means of fraudulent representations and there was a failure of consideration. The payee transferred the note before maturity and for a valuable consideration to the plaintiff bank. In an action thereon, the trial Court, at the instance of the plaintiff, instructed the jury that if they found that when the plaintiff acquired the note it had no notice of any fraud in its obtention, or of any failure of consideration therein, then the plaintiff is entitled to recover, and that there was no legally sufficient evidence from which the jury could find that the plaintiff had any knowledge or notice of fraud or want of consideration in the making of the note. At the instance of the defendants the Court also instructed the jury that if they found that the note was obtained from the defendants by fraud, then the burden is on the plaintiff to show that it became the holder of the note before it was overdue, in good faith, for value and without notice of any infirmity or defect in the title of the persons negotiating it to the plaintiff, and unless the jury believe from the evidence that said note was thus acquired by the plaintiff their verdict should be for the defendants. *Held*, that there is a direct conflict between these two instructions, because by the first the jury are told that there is no legal evidence of knowledge or notice of

fraud, and yet by the second they are allowed to find that the note was not taken in good faith; that, as the case is now presented, plaintiff's instruction was properly granted, and defendants' instruction should have been refused.

*Held*, further that if, upon the facts of the case, such an instruction as that of the defendants above mentioned could properly be granted, then it was error to reject an instruction asked by the plaintiff to the effect that if the plaintiff acquired the note without knowledge that it had been obtained by fraud, then the plaintiff is a *bona fide* holder, and merely suspicious circumstances sufficient to put a prudent man on inquiry, or even gross negligence on the part of the plaintiff at the time it acquired the note, are not sufficient of themselves to prevent a recovery, unless the jury find from the evidence that in taking said note the plaintiff acted in bad faith.

The note in this case, when taken by the plaintiff, bore the following endorsements : "Received of J. W. D. $33.33 on the within note, and he is hereby released from further payment on the same." "Received of E. D. H. $33 33 on the within note." Neither was signed. *Held*, that if these endorsements were the only suspicious circumstance or evidence to show knowledge of fraud by the plaintiff, then such circumstance or evidence was not legally sufficient to show bad faith or to prevent recovery by the plaintiff, and the jury should have been so instructed.

One who takes a promissory note before maturity and for value, without notice or knowledge of defects in the title of the endorser or fraud in its inception, is a holder in good faith.

Appeal from the Circuit Court for Frederick County (HEN-DERSON and MOTTER, JJ.)

*Plaintiff's 3rd Prayer.*—That neither suspicion of defects in said note, or of fraud in its obtention, or the knowledge of circumstances which would excite suspicion in the mind of a prudent man, or gross negligence on the part of the plaintiff, is sufficient to charge said plaintiff with notice of any fraud or failure of consideration in said note. (*Rejected.*)

*Plaintiff's 4th Prayer.*—If the jury find from the evidence that the plaintiff acquired the note in question for a valuable consideration before its maturity, and that it acquired said note without knowledge that the same had been obtained by fraud or without consideration, then the jury must find that the plaintiff is a *bona fide* holder of said note for value, and merely suspicious circumstances sufficient to put a prudent man on in-

quiry, or even gross negligence on the part of the plaintiff at the time it acquired said note, are not sufficient of themselves to prevent a recovery by the plaintiff, unless the jury find from the evidence that in taking said note the plaintiff acted in bad faith. (*Rejected.*)

*Plaintiff's 6th Prayer.*—That if the jury find from the evidence in this cause that the defendants signed the note sued on in this case, and shall further find that said note was endorsed and delivered to the plaintiff by the payee thereof for value before its maturity and shall further find that said plaintiff at the time it acquired said note had no notice of any fraud in the obtention of said note, or of any failure of consideration therein other than the note itself shows, then their verdict shall be for the plaintiff, provided they shall find that there was due at the time of the institution of the suit from the said payee, on account of the loan for which said note was endorsed and delivered as security, an amount greater than the amount of said note. (*Rejected.*)

*Defendants' 4th Prayer.*—That if the jury believe from the evidence that the promissory note sued on in this case was obtained from the defendants by fraud, then the burden of proof is on the plaintiff to show that it became the holder of said note before it was overdue in good faith for value and without notice of any infirmity or defect in the title of persons negotiating it to the plaintiff, and unless the jury believe from the evidence that said note was thus acquired by the plaintiff their verdict should be for the defendants. (*Granted.*)

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, BOYD, PEARCE and SCHMUCKER, JJ.

*Edgar H. Gans* and *John S. Newman* (with whom were *Charles W. Ross* and *Emory L. Coblentz* on the brief), for the appellant.

From a comparison of the plaintiffs' first prayer and the defendants' fourth it is evident that while the Court instructed the jury that there was no evidence in the case that the plain-

tiff had any *knowledge or notice of fraud or want of considera-
tion in taking the note* there was left to the jury the question
whether the plaintiff took the note in *good faith.* We con-
tend that these instructions were inconsistent. While the
fourth prayer is not objectionable in form it should not have
been granted in this case in view of the concluding clause of
the plaintiff's first prayer ; in other words, if the plaintiff had
no knowledge or notice of any fraud, &c., in the inception
of the note, then there was also no evidence from which the
jury should have been allowed to say that the plaintiff acted
in bad faith in taking the note. The proposition is probably
more accurately expressed as follows :

*One who acquires a note before maturity for value from the
payee without knowledge or notice of any infirmity or defect in the
title of the payee thereto is a holder in due course of said note
which includes the taking of said note in good faith.*

The correctness of this proposition must be found in a con-
sideration of the Negotiable Instrument Act passed by the
Legislature in 1898, to be found in *Poe's Supplement to the
Code,* Art. 13. Prior thereto there had been quite a number
of cases in which this Court discussed what constitutes one a
*bona fide* holder of a note who takes the same free from the
equities of the original parties. Of these cases the following
are the most conspicuous : *Maitland* v. *Citizens' Nat'l Bank,*
40 Md. 540; *Citizens' Nat'l* v. *Hooper,* 47 Md. 88; *Williams*
v. *Huntington,* 68 Md. 590; *Griffith* v. *Shipley,* 74 Md. 591;
*Cover* v. *Myers,* 75 Md. 406; *Banks* v. *McCosker,* 82 Md. 518;
*McCosker* v. *Banks,* 84 Md. 292; *Buchanan* v. *Mechanics' Loan
and Savings Institution,* 84 Md. 430. These cases adopt the
present English rule on the subject agreeing in that respect
with the great majority of the Courts in this country. The
Court will also recall the history of the English law on the
point which will be found reviewed in 1 *Daniel on Negotiable In-
struments,* chapter 24.

The early English rule as to who was a *bona fide* holder ap-
plied the simple test of whether the plaintiff took in good or
bad faith. This rule was later departed from by the adoption

of the rule to the effect that a holder was not freed from equities if he took the note under such circumstances as would have caused a reasonably prudent man to have made inquiries into the facts.    Later this test was itself modified by the doctrine that to defeat the rights of the holder against the maker he must have taken the note under circumstances showing gross negligence on his part.    Finally the rule was re-established in accordance with its earliest form, the test being simply that of honesty or dishonesty on the part of the taker of the note or *bona fides* or *mala fides*.    The matter of knowledge or notice was simply a question of evidence bearing upon the sovereign test of good or bad faith.    Thus while actual knowledge by the taker of the equities between the original parties was conclusive of the question of bad faith, mere notice of circumstances which might arouse suspicion or even gross negligence on the part of the taker was not conclusive.    At the utmost it was simply some evidence tending to show bad faith.    The history of judicial decisions on this question prior to the enactment of the Negotiable Instrument Act shows clearly a determination on the part of the Courts to put the law in a more favorable attitude towards the rights of one who takes commercial paper for value.    The necessity of this is quite apparent when it is remembered that a suit of a holder of such a note must ordinarily be enforced against the maker thereof before a jury whose natural sympathies are aroused in favor of the maker who has been defrauded.    In order to uphold the rights of such a holder of commercial paper it is necessary that the law be emphatically and distinctly declared by the Courts, so as not to leave to the speculative sympathies of the jury an opportunity to exempt a defrauded maker at the expense of the holder for value.    The reason of this tendency to uphold the rights of the holder in due course, is of course found in the importance to the commercial world of having commercial paper pass readily current for value.    While this tendency on the part of the Courts is plainly evident, yet there were many cases in which the definition of a *bona fide* holder were somewhat indefinite.    It was with a view to making the

law on this point as well as other question of bills and notes
more certain that the Negotiable Instrument Act was recom-
mended by the American Bar Association and passed by the
Legislature of many States.    In the Maryland Act, which is
almost identically the same as that of the other States, which
have passed this law, the rights of a holder of negotiable paper
other than an immediate party thereto are defined by the sub-
chapter 5, secs. 70 to 78 inclusive.

From this definition it is apparent that the relative positions
of notice and bad faith in reference to the rights of a holder
are reversed, that is, while formerly bad faith was the general
question with notice as a subsidiary element or rather eviden-
tiary fact, now notice is the general question with bad faith as
the subordinate one.    In other words, notice is the broader
question consisting either.    1. Of actual knowledge of an in-
firmity or a defect, or 2.    Knowledge of such facts as to show
bad faith on the part of the holder.

Referring now again to the two prayers granted we find that
the Court specially instructed the jury that the plaintiff had
no knowledge or notice of fraud or want of failure of consid-
eration in the making of the note sued on (and it is not con-
tended there was any other element of infirmity in the instru-
ment or defect in the title of the payee) and yet, at the same
time, the Court leaves to the jury, by the defendant's fourth
prayer, the opportunity to find bad faith on the part of the
plaintiff in taking the note.    Notice being the broader ques-
tion and including bad faith and the Court having expressly
declared that there was no notice it was error to allow the jury
to find any bad faith on the part of the plaintiff.

But, apart from the aforegoing consideration of the relation
of notice and good faith to be drawn from the negotiable in-
strument law it is very difficult to conceive of any set of cir-
cumstances which apart from either knowledge or notice of
infirmity or defects in the formation of the note or title of
former holders thereto, would give rise to a presumption of
bad faith on the part of a subsequent taker.    Apart from the
Act, bad faith may be considered a broader question than act-

ual knowledge, but not broader than notice, which is of itself actual knowledge of such facts which, if made the basis of inquiry, would disclose defects in the note.    In a number of Maryland cases on the subject the expressions of the Court have indicated that good faith and knowledge or notice of the infirmity of the note are equivalent terms.    *Totten* v. *Bucy*, 57 Md. 451; *Williams* v. *Huntington*, 68 Md. 601; *Crampton* v. *Perkins*, 65 Md. 22.

If, however, the Court concludes that the question of good faith is a question independent of and apart from that of notice, and that, therefore, the defendant's fourth prayer was properly granted then the Court erred in rejecting the plaintiff's fourth prayer.    There can be no doubt that this latter prayer is unobjectionable and entirely good.    It is copied *verbatim* (with the exception of the substitution of the word "acquired" for that of "purchased") from the plaintiff's second prayer in the case of *Cover* v. *Myers*, 75 Md. 406.    That case presented the same issues as the one under discussion.    The plaintiff's second prayer in that case was granted by the Court below (JUDGE JONES) and met with no criticism, on the appeal, although the judgment in the case was reversed and a new trial awarded.    By the refusal of the plaintiff's fourth prayer in the present case the jury were left without any instruction whatever as to what constituted good faith, and, consequently, were at liberty to speculate about the matter.

Again it was error for the Court to reject the plaintiff's sixth prayer.    In this, the plaintiff asked an instruction for itself if the jury should find that at the time the plaintiff acquired the note it had no notice of any fraud in the obtention of said note or any failure of consideration *other than the note itself showed*, &c.    As the Court decided on granting the first prayer of the plaintiff that there was no legally sufficient evidence of notice whatever, the further action of the Court in granting the defendant's fourth prayer and rejecting the plaintiff's sixth prayer would seem clearly to indicate that the Court was of the opinion that there was some evidence legally sufficient to show *mala fides* on the part of the plaintiff, which

could be inferred by the jury by virtue of the receipts and re-
lease endorsed on the note.    In this we think there was error
and that the Court should have instructed the jury on the facts
of this case that there was no legally sufficient evidence of
any bad faith.    The question of any bad faith *vel non*, was
really one of law rather than one of fact.    In this connection
it will be remembered that the plaintiff rested its case after the
introduction of the note.    The defendant then gave evidence
tending to show fraud in the inception of the note after which
the plaintiff, as was incumbent upon it gave evidence showing
the circumstances by which the note had been acquired by it.
These circumstances, we contend, fail to give rise to any pre-
sumption of bad faith by the plaintiff in the transaction.    It
was, however, then competent for the defendant in rebuttal to
show that the plaintiff had actual knowledge or notice of the
infirmity or defect of the note.    If this had been done by the
defendant an issue of fact on the point would properly have
been submitted to the jury, but in default of such rebutting
evidence it was entirely competent and proper for the Court
to rule as a matter of law that no presumption of bad faith
arose from the circumstances attending the acquisition of the
note by the plaintiff.    *Hamilton* v. *Vought*, 34 N. J. Law, 187;
*Cheever* v. *R. R. Co.*, 150 N. Y. 65; *Am. Exchange Bank* v.
*N. Y. Belting Co.*, 148 N. Y. 698.

Why should the question of good faith have been left to
the jury in this case?    The theory of bad faith, as separate
from knowledge of infirmity in the instrument, is that the cir-
cumstances surrounding the taking of the instrument by the
holder were of such a nature that he ought to have made
a further investigation which, if it had been made, would have
revealed to him the actual knowledge of the infirmity or defect,
or the equities between the original parties.    But this theory
has no foundation in fact here.    The evidence shows that Mr.
E. L. Coblentz did enquire from Hanan, agent of the payee,
what was the meaning of the endorsements on the notes, and
that Hanan informed him of what the actual circumstances
were.    If the same question had been asked each one of the

defendants the same information must necessarily have been given. *It would be most unreasonable to charge bad faith to a taker for his failure to learn facts or possible equities not known at the time of the taking to the makers of the instrument.* It will be remembered that the notes were executed April 11th and 12th, and were taken by the plaintiff on April 29th. It is not pretended that at the latter time any of the defendants had any knowledge of fraud practiced upon them in the making of the notes or of any failure of consideration with respect thereto. And it is of course well settled that facts coming to the attention of the holder after the taking of the instrument do not affect his rights in any way. On the contrary, the evidence shows that the bank's action in taking the note was in the due course of business and entirely honest.

*As to the release.* It will be noticed that this so-called release is not under seal and is not even signed. It, therefore, could not possibly amount to anything more than an agreement not to sue Downey on the note. It is, of course, true that where one of two or more joint or joint and several makers of an instrument is validly released his co-makers are also discharged from liability. But this occurs only when the release is a technical one under seal, and even in the latter case when the intention of the parties is apparent not to create a release of the obligation, Courts construe the release simply as a covenant not to sue. The case of *Elgin City Banking Company* v. *Self* (Texas Civil Appeals, 1896), 35 S. W. Rep. 953, presents a case practically identical in every respect with the case at bar, where this same defense was made. In that case two notes had been given by nineteen joint makers in payment of a stallion. One of the makers for services rendered to the payee in connection with the transaction including the use of his influence in procuring the others to sign the note was credited with $150 on the note by the payee, and was also given a release under seal from any further liability on the note which was subsequently negotiated to the plaintiff, which brought the suit. The stallion having proved worthless the defense was made that by the release of one of the

joint makers all were discharged. The Court, however, over-ruled this defense.

In *Line* v. *Nelson*, 38 N. J. L. 358, one of the joint makers of a note paid one-half of it and the payee agreed to release him from further payment. This was relied on as a defense to a suit on the note. Said the Court, "That a release to one of several obligors, whether they are bound jointly, or jointly and severally, discharges the others and may be pleaded in bar by all, will not be controverted. 2 *Saund.*, 48, note 1; *Collyer on Partners*, secs. 606–8; *Rowley* v. *Stoddard*, 7 Johns, 207. But a release of one of two joint promissors, to have this effect, must be a technical release under seal. In *Harrison* v. *Close*, 2 Johns, 447, an agreement in parol not to look to one of two joint and several makers of a promissory note for payment, was held to constitute no defense to the action. This case was approved and the rule fully recognized by the New York Courts in the following, among other cases. *Rowley* v. *Stoddard*, 7 Johns, 207; *Catskill Bank* v. *Messenger*, 9 Cowen, 36; *Frink* v. *Green*, 5 Barb. 455.

The same doctrine prevails in Massachusetts. *Shaw* v. *Pratt*, 22 Pick. 305, cites the New York cases, and says, that the principle is well settled; and it is so regarded in the later case of *Pond* v. *Williams*, 1 Gray, 630   In our own State, the case of *Administrators of Crane* v. *Elling*, 3 Green, 423, is an authority to the same effect. This view is fuly supported by the English authorities referred to in the cases above cited The reason of the rule is, that an agreement not under seal to discharge a particular person or not to sue him does not extinguish the debt, and therefore cannot bar the suit to recover it." To the same effect are the following cases, of which nearly all were suits on notes : *Merchants' Bank* v. *McAnulty*, 89 Tex. 124; *Pannel* v. *McMechen*, 4 H. & J. 474; *Salmon* v. *Clagett*, 5 G. & J. 315–54; *State* v. *Gott*, 44 Md. 345–7; *Wood* v. *Brett*, 9 Grant Ch. (U. C.) 452; *Bradford* v. *Prescott*, 85 Me. 482; *Goodnow* v. *Smith*, 18 Pick. 414; *Ruggles* v. *Patten*, 8 Mass. 480; *Shaw* v. *Pratt*, 22 Pick. 305; *Pond* v. *Williams*, 1 Gray, 630–6; *Bender* v. *Been*, (Ia.) 5 L. R. A. 596; *Brantly Contracts*, pp. 45–6.

In section 1290 of *Daniel on Negotiable Instruments* the author states: "The release of a party to a bill or note by any agreement upon a valuable consideration is as effectual as if under seal." In the note he cites the following cases: *Benjamin v. McConnell*, 4 Gilm, 236; *Millikin v. Brown*, 1 Rawle, 391; *Nicholson v. Revill*, 4 Ad. & El. 675; *Sterling Wrench Co. v. Amstutz*, 50 Ohio St. 484.

Of these cases *Millikin v. Brown*, in 1 Rawle has been over-ruled by *Burke v. Noble*, 48 Pa. St. 168–74.

*Nicholson v. Revill* has been somewhat criticised in *Kearsley v. Cole*, 16 M. & W. 128.

*Benjamin v. McConnell* was followed in *Rice v. Webster*, 18 Ill. 331–3, but both cases were dissented from, if not over-ruled, by the later case of *Parmalee v. Lawrence*, 44 Ill. 405–13, which is cited with approval in *Moore v. Stanwood*, 98 Ill. 608, and in *Chicago v. Babcock*, 148 Ill. 353–66.

*Milton G. Urner* and *J. E. R. Wood* (with whom was *Hammond Urner* on the brief), for the appellees.

The release of Dr. J. W. Downey, one of the makers of the note, before maturity, without the knowledge and consent of all the other makers, operated in law to release all the makers. There is no principle better established by authority than that where two or more persons are jointly and severally bound and the obligee releases one of them, *at law* they are all discharged. *Nicholson v. Revill*, 4 Ad. and El. 675; *Clagett v. Salmon*, 5 G. and J. 351; *Yates v. Donaldson*, 5 Md. 389; *Booth v. Campbell*, 15 Md. 569; *Blackburn v. Beall*, 21 Md. 208; *Obendorff v. Union Bank*, 31 Md. 126; *Smith v. State*, 46 Md. 617; *Tuckerman v. Newhall*, 14 Mass. 584.

It was held in the Court below that one joint maker can only be discharged from liability by a technical release under seal, and that as Dr. Downey was not released in that manner he was not discharged. In that the Court below was clearly wrong.

The only question in any case is whether the agreement to release is a valid, binding contract; whether it is binding upon

the obligee or the person who has agreed to release.   Like all contracts, the agreement must have a consideration to support it.   A seal imports a consideration, and therefore an agreement under seal to release is good without any other consideration than the seal imports.   A simple agreement to receive part of an *overdue* debt in full satisfaction of the whole and to release the debtor from the balance is without consideration and, therefore, not binding.   But if the debt is *not due* and one of the makers of a joint, or joint and several, obligation pays what he is then under no legal liability to pay, and in consideration of that the obligee agrees to release the one who makes the payment, such agreement is based upon a sufficient consideration and is binding.   A very slight consideration is sufficient to support such an agreement.   "If the obligor or lessor pay a lesser sum either *before the day* or *at another place* than is limited by the condition, and the obligee or feoffee receiveth it, this is a good satisfaction."   *Fitch* v. *Sutton*, 5 East. 227.   *Pinpel's case*, Coke's Reports, part 5, p. 117.

In *State, use of Barnard* v. *Gott*, 44 Md. 341, it was held that a release, *being under seal*, to the principal discharged the surety.   There the whole fund was due and payable, and the only consideration for the discharge of the principal, as to the whole upon payment of part only, was what the seal imported.

In the case of *Steinman* v. *Magnus*, 11 East. 391, a release, *not under seal*, of an *overdue debt*, by the payment of twenty per cent of the amount due, was held to be a binding release, because there was an independent consideration to support it; and in *Bender* v. *Been*, (Ia.), 5 L. R. A. 597, it was held that a release *under seal* of an overdue paper was not a discharge if the deed of° release by its recitals showed it was really given without consideration.

But in this case Dr. Downey signed the notes in question in pursuance of a previous agreement that he should be released, and his release was but an execution of that agreement. He refused to sign until he was furnished by the payees with $100 with which to pay his share.   He signed at payee's request as an inducement for the defendants to sign, and when

the payees had accomplished their fraudulent purpose, the secret agreement was consummated by Downey paying back the $100 and being released.    It goes without saying, that the release was binding upon the payees, and if binding upon them, then upon principle and authority the defendants, the co-makers, were thereby released.

Each defendant signed the notes as one of fourteen makers who were jointly and severally bound for the whole debt. By the contract thus entered into each maker was not only responsible for his one-fourteenth part, but in case of the insolvency of any the share of the solvent makers would be thereby increased, and if any one should be required to pay more than his share, he would have the right to demand contribution from his co-makers. Such was the contract and its legal effect as originally made, and when Dr. Downey was released that contract was materially altered.

The plaintiff in this case is not entitled to any equitable consideration, because it took the notes with full knowledge, disclosed by the endorsements on the notes themselves, that Dr. Downey, the first maker, had been released, and is chargeable with knowledge of the law, that a release of one joint maker releases all. The note was not "complete and regular on its face" when taken by the plaintiff. The plaintiff recognized Downey's release by not joining him as a defendant in the suit. It was error to omit him from the suit if he was not released. A joint and several note must be treated as "wholly joint or wholly several." All the makers must be sued on jointly or each one separately. *Merrick* v. *Bank of Metropolis,* 8 Gill, 59; *Poe's Pleading,* sec. 382.

The infirmities in the note sued on consist in its having been procured by fraud and in the absolute failure of consideration, which are established by incontrovertible proof and the admission of the plaintiff. The plaintiff was then required, "before *it* could legally recover, to establish by proof that *it* was the *bona fide* owner of the note; that *it* acquired it for value before maturity, and without notice or knowledge of any infirmities in its origin." *Williams* v. *Huntington,* 68 Md. 598;

*Griffith* v. *Shipley*, 74 Md. 599, &c.; *Totten* v. *Bucey*, 57 Md. 452.

If the plaintiff did not comply with this legal requirement, then the plaintiff's first prayer ought not to have been granted and the defendant's first and second prayers, offered at the close of the case, should have been granted. The appellees insist the plaintiff's proof of the want of knowledge of the fraud and failure of consideration was not legally sufficient. The plaintiff is a corporation and can only act through its officers and agents and through them it acquires binding information. If the burden is on a natural person to prove "that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it," then that burden is equally upon a corporation and to discharge the same it is necessary to prove by each officer whose knowledge, if he possessed the same, would bind the plaintiff, that he did not possess such binding information. The plaintiff proved by its president, treasurer, discount clerk and the three members of the loan committee that they had no knowledge of the fraud, but they do not testify they had no notice of the other infirmity, the want or failure of consideration—the admitted fact in the case. The evidence shows the notes were at least informally discussed at a meeting of the board of directors, when a quorum was present, which must have been at least six members. Now, if any one of these directors had been notified officially of the fraud in the procurement of the note or that it was given without consideration, and such notice had been given for the purpose of being communicated to the board, the plaintiff would have been bound by it. *U. S. Insurance Co.* v. *Shriver*, 3 Md. Ch. 388. It was therefore incumbent upon the plaintiff to negative such knowledge as to each of its officers and directors, who were connected with the transaction, and it undoubtedly failed to meet this requirement.

The granting of its first prayer rendered the 2nd, 3rd, 5th and 6th prayers of plaintiff unnecessary and superfluous, as they all, in various forms submitted the question of notice to

the jury and defined its scope and meaning. It is apparent that these prayers were offered only to meet the emergency of the first prayer being rejected. They could only be serviceable or pertinent in the event of the rejection of the plaintiff's first prayer, and they were entirely superseded when that prayer was granted. The appellant certainly cannot complain that its definitions of notice were not given to the jury and that they were not left to find whether or not there was notice, when upon its own application the jury were instructed that there was no notice at all.

It is submitted that appellant's 4th prayer is bad on various grounds. In the first place it is confusing and contradictory. It tells the jury that if plaintiff acquired the note without notice of fraud or want of consideration, then plaintiff was a *bona fide* holder for value, and that suspicious circumstances and gross negligence will not prevent a recovery, unless the jury find from the evidence that the plaintiff in taking the note acted in bad faith. The first and granted prayer of plaintiff, instructed the jury that plaintiff had no notice, and if the fourth prayer had been also granted, the two together would have declared in effect that as the plaintiff had no notice of fraud or want of consideration it was a *bona fide* holder for value unless the jury found it took the note in bad faith. It would begin by taking from the jury the question of *bona fides* and end by leaving that question to their determination.

"Good faith" is something distinct from "no notice." If in some of the decisions prior to the Negotiable Instruments Act there was a tendency to blend the questions of good faith and notice, there can now be no doubt that proof of an acquisition for value and without knowledge of the infirmity of the instrument does not necessarily establish good faith. The latest case upon this subject recognizes this plain distinction in a prayer which deals separately and independently with the question of bad faith and which received the approval of the Court of Appeals. *Black* v. *First National Bank of Westminster*, 96 Md. 399.

It is also contemplated by the Negotiable Instruments Act

that the endorsee, without having had actual knowledge of the infirmity or defect, may have had knowledge of "such facts that his action in taking the instrument amounted to bad faith." *Code*, P. G. L., Art. 13, sec. 75. "Mere negligence or want of caution, such as may exist without the imputation of bad faith, will not do; but a party must not be willfully blind and inattentive to such facts and circumstances as would lead him directly to the knowledge of the infirmities of the paper." *Griffith* v. *Shipley*, 74 Md. 600; *Gordon* v. *Jones*, L. R., 2 App. Cas., 616; *Canajoharie Bank* v. *Diefendorf*, 123 N. Y. 191; *Shirk* v. *Neihle*, (Ind.), 59 N. E. Rep., 282.

It is not necessary to discuss the facts of the case as bearing upon the question of good faith. This question was submitted to the jury and was determined by their verdict adversely to the plaintiff. It was proposed to be submitted to the jury by the plaintiff's 4th prayer, and was actually submitted to them by the defendants' 4th prayer, and as no special exception was taken by the plaintiff to the granting of the defendant's prayer, this Court will take it as an established fact that there was legally sufficient evidence from which the jury could find that the plaintiff did not acquire the note in good faith. *Gunther* v. *Dranbauer*, 86 Md. 1; *Gambrill* v. *Schooley*, 89 Md. 549.

The plaintiff can have no valid objection to the granting of the defendants' 4th prayer. It embodies correct principles of law in the very terms of the Negotiable Instruments Act and it submitted to the jury the question of good faith upon the evidence in the case. This evidence was not only legally sufficient, but was clear and convincing as to the plaintiff's want of good faith in this transaction, and in the absence of a special exception this will not now be considered an open question.

FOWLER, J., delivered the opinion of the Court.

This is a suit by the Valley Savings Bank of Middletown on a promissory note for $600. The makers of this note are the thirteen defendants and J. W. Downey. The note is joint

and several dated April 11th, 1901, and payable one year after date to order of R. S. Delauder & Co.  The following endorsements appear on it: "Received of J. W. Downey thirty-three 33-100 dollars on within note, and he is hereby released from any further payment on the same;" and "Received of E. D. Hobbs thirty-three 33-100 dollars on within note." Neither of these was signed, but it appears by the evidence that Downey wrote the first, but there is nothing to show who wrote the second.  Following these appeared the endorsement written on the note at the time it was delivered to the plaintiff.

It appears from the testimony that one Hanan, acting or pretending to act as agent for Delauder & Co., the payee of the note, undertook to sell a Spanish Jack to certain residents of Frederick County for breeding purposes.  The price of the animal was agreed to be fixed at $1,800.  The evidence shows, and indeed it is conceded, the whole transaction was a fraud on the part of the agent of the vendors, whose plan was to get subscriptions from eighteen persons of $100 each to purchase the animal.  He persuaded Dr. Downey to subscribe in order that others might be induced to follow his example and secretly gave him the money to pay his subscription.  It is not necessary however to narrate all the facts relating to this fraudulent transaction.  It is sufficient to say that the defendants with Downey signed and delivered to Hanan, the agent or alleged agent of the vendors, three notes each for $600 for the purchase-money agreed to be paid for the jack—the note sued on in this case being the first of the series.  It also appears that Hobbs never did sign the notes, because he agreed to pay his subscription in cash.

Having thus secured the execution of the three notes, Hanan applied to Mr. Coblentz, one of the directors of the plaintiff bank, to get his assistance in borrowing money on them. After some negotiation and examination into the financial standing of the makers of the note, the plaintiff decided to make a loan of $1,600 to R. S. Delauder & Co. and take the three $600 notes as collateral security.  The proceeds of this

loan were placed to the credit of Delauder & Co. and were subsequently checked out and used by them.

The defendants have all pleaded the general issue. During the trial the plaintiff took two and the defendants five exceptions—some of them relating to the rulings of the Court upon objection to testimony and some to the granting or refusal of their respective prayers. The precise points of the various exceptions will appear further on when we consider them. The verdict and judgment were in favor of the defendants, and although we have before us in this record only the appeal of the plaintiff we will, in accordance with the provisions of sec. 76, Art. 11 of the Public Local Laws (Frederick County), pass upon all the exceptions of all the parties inasmuch as our conclusion is that the judgment must be reversed.

1. In the first place we will consider the question presented by the release of Downey, one of the joint makers of the note sued on. The defendants contend that the legal effect of this release was to discharge all the other joint makers. The general rule has often been said to be that where one or two or more joint, or joint and several, makers of an instrument are validly released all are discharged. But this general statement has frequently been somewhat restricted, and it is said, and we think the rule is supported by reason as well as authority, such a result will not necessarily follow, unless the release is a technical one under seal. Thus in the case of *State* v. *Gott*, 44 Md. 346, &c., the rule as applicable to contracts is said to be, quoting from *Story on Contracts*, "A release under seal, if given to one of several debtors jointly liable, enures to the benefit of all. But a release by parol to one debtor will not operate as a discharge to other debtors jointly liable, and can only be pleaded by the debtor to whom it was given." The reason of this rule is said to be that an agreement not under seal to discharge a particular person or not sue him does not extinguish the debt, and therefore cannot bar the suit to recover it. *Line* v. *Nelson*, 38 N. J. L. 358. But whatever the reason may be, the rule itself, as announced in *State* v. *Gott, supra*, is firmly established; and as was said in that case in 1875 we can say

now, we have not been referred to any satisfactory authority in which this doctrine has been overruled.

Several Maryland cases were relied on by the defendants to support their views as to the effect of the release of Dr. Downey, but we do not think they do so. Thus *Claggett* v. *Salmon*, 5 G. & J. 351, was a case of principal and surety and it was in considering the rights of a surety that the Court used the general language relied on by the defendants. There was in that case no question before the Court requiring any consideration of the effect of a *parol* release on the liability of *joint debtors* when, as here, they are *all principals.* The same may be said in regard to *Oberndorf* v. *Union Bvnk*, 31 Md. 126, and *Blackburn* v. *Beall*, 21 Md. 208. In *Yates* v. *Donaldson*, 5 Md. 389, the joint debtors purchased certain property from their creditor for $1,700, which they agreed in writing to pay at a stipulated time. Subsequently the creditor agreed to accept from one of them notes for two-thirds, and from the other notes for one-third, of the joint indebtedness. One of the joint debtors complied with his part of the agreement and paid his notes at maturity, but the other failed to fully do so. The creditor sued both of them to recover the balance. It was held that while, if the parties had been principal and surety, such a contract would have released the one who was surety, yet being both principals it did not have that effect. It is true the Court used the language relied on by the defendants and used it in regard to principals, namely, that " if one be released both will be, except in a case where the remedy against the other is expressly reserved." But the question still remains, how *released.* Of course if the release is under seal and shows, as in *State* v. *Gott*, that the indebtedness is satisfied, all the joint debtors would be released ; but if the release is only by parol such release can be pleaded as a discharge only by the debtor so released. *State* v. *Gott, supra.* And in the very case relied on by the defendants (*Yates* v. *Donaldson, supra*), it was held that the matters relied on by one of the joint debtors was not a good defense, and that in a case like that and the one we are considering, where all are

principals, it would be impossible to adjust the equities in a suit at law by the creditor.    It would be impossible, said the Court, to render a judgment upon any adjustment of these equities, because the only judgment in such a case must be for the same amount against all the defendants.    Another Maryland case cited by the defendants is *Booth* v. *Campbell,* 15 Md. 569, in which it was said that a release or discharge of one of several defendants in a judgment, jointly liable thereon, operates as a discharge of all.  Undoubtedly an effective and valid release must have that effect, but the question again arises what kind of a release or contract did the Court in that case hold would operate as a discharge.    There was a parol agreement on the part of the judgment creditor and one of the judgment debtors that if the latter would pay twenty per cent on the amount of the judgment, and secure a certain contract from another party (which latter condition was held to be a good collateral consideration), the judgment creditor would "release the judgment."    The sum agreed upon was paid and a receipt of the creditor therefor was filed in the cause with an entry *on the record* of its being *in full of said judgment.*    This, together with the additional collateral consideration, was held to be a good accord and satisfaction.    In other words, the judgment having been satisfied *all* liability therein was discharged.    The very record which showed the existence of the judgment evidenced its satisfaction, and *being satisfied* the judgment of course cannot be made the basis of a suit against anybody.    The case now before us presents a very different state of facts.

We do not think, therefore, that there was error in the various rulings of the Court below refusing to recognize the release of Downey as a discharge of the defendants and a bar to this suit.    What we have said above disposes of the defendants' first and second bills of exceptions relating to testimony and to their fifth so far as it is based on the rejection of their third, sixth and seventh prayers.

The most important of the remaining questions is presented by the plaintiff's second bill of exception, which relates to

the granting of defendants' fourth and the rejection of plaintiff's second, third, fourth, fifth and sixth prayers.

First, then, in regard to the granting of the defendants' fourth prayer. In order to consider the question presented by this exception, we will have to refer to plaintiff's *first* prayer which, as we have seen, was granted. By this prayer the jury was instructed that if they find from the evidence that the defendants signed the note sued on and that said note was endorsed by the payee and delivered to the plaintiff for a valuable consideration, before said note became due and payable, and shall find that said plaintiff at the time it acquired said note had *no notice of any fraud in the obtention* of said note, or of any *failure of consideration therein*, then the plaintiff is entitled to recover the full amount of said note, less certain credits. The prayer thus concluded—"and there is no evidence in this case legally sufficient from which they can find that the plaintiff had any knowledge or notice of fraud, or want or failure of consideration in the making of said note." The fourth prayer of the defendants, which was also granted, embodies in it the general and well settled doctrine applicable to negotiable paper, that if there is fraud in the origin of the note the burden of proof is upon the holder to show that it came to him before maturity in good faith for value and without notice of any infirmity or defect in the title of the persons who transferred it to him. But in addition to the assertion of this general proposition the jury are informed that, "unless they believe from the evidence that said note was *thus* acquired by the plaintiff their verdict should be for the defendants." It seems to us, in spite of the ingenious argument of the able counsel for the defendants to the contrary, that there is a direct and palpable conflict between these two instructions. By the first the jury are told that they cannot in this case find that the plaintiff had any *knowledge or notice of fraud* or failure of consideration in the making said note, while by the other they are permitted, if they will, to find from the same evidence that the plaintiff did not obtain the note in good faith. In other words while they are told there is no legal evidence of knowl-

edge or notice of fraud, they may yet find in point of fact that the note was not obtained in good faith.    It is difficult indeed to understand how the holder of commercial paper can take it in good faith, without notice of defects in title and without knowledge of fraud, and at the same time be in a position to have his good faith in the transaction questioned.    This is what the fourth prayer in our opinion allows the jury to do. It is most desirable, if possible, to free a practical question like this from fine distinctions, and we think the decisions of this Court have shown a strong tendency in that direction.    Thus in the leading case of *Totten* v. *Bucy*, 57 Md. 446, the former learned Chief Justice of this Court said : "The question is not what facts will or will not be sufficient to put the party on in-quiry, but the question whether the party had *knowledge of the infirmity of the note* at the time of the transfer to him; or *in other words*, whether he procured the note in *good faith* for valuable consideration."    *Maitland* v. *Bank*, 40 Md. 568; *Bank* v. *Hooper*, 47 Md. 88; *Williams* v. *Huntington*, 68 Md. 590–601.    And so in the case last cited the present Chief Justice quotes the language of JUDGE ALVEY with approval and says : "The question is one of fraud or bad faith on the part of the taker of the note."    In *Cheever* v. *Pittsburg R. R. Co.*, 150 N. Y. 65–67, it is said : "The rights of the holder are to be determined by the simple test of honesty and good faith and not by a speculative issue as to his diligence or neg-ligence."    Equally clear, simple and broad is the rule ex-pressed in sec. 75, of Art. 13 (our Negotiable Instruments Act), by which, of course, we must be governed.    The notice, that section provides, which will prevent a holder of a note from recovering is "actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instru-ment amounted to bad faith."    But the prayers in question, as we have seen, after telling the jury in the first that there is no legally sufficient evidence of any knowledge or *notice of fraud* in the making of the note, allowed them by the fourth to find, either that the plaintiff was not a holder in good faith before maturity, or, second, that it had notice of infirmity or defect

in the title of its endorser.    The jury could under this prayer
have found, and perhaps they did find, that in spite of the fact
there was no legally sufficient evidence of *knowledge* or *notice
of fraud* in the *making of the note*, yet that the evidence be-
fore them justified them in finding the plaintiff was not ·a
holder *in good faith* because it had notice of some defect or in-
firmity in the title of its endorser growing out of the worth-
lessness of the animal purchased by the defendants.    It is
clear, however, that by the first prayer they were in effect told
there was no legally sufficient evidence of knowledge or no-
tice of any such failure of consideration, but if under any·
theory of the case. such a prayer as the· defendant's fourth
could have been properly granted, submitting to the jury the
question whether the plaintiff acquired the note in good faith
for value before maturity and without notice, &c., then it was
error to have rejected the plaintiff's third and fourth prayers
based upon the theory that mere suspicion of defect of title or
knowledge of circumstances which would excite such suspi-
cion in the mind· of a prudent man, or gross negligence on·the
part of the taker of the note at the time of transfer, will not
defeat his title."    *Williams* v. *Huntington, supra.*.    We think,
moreover, that if the Court could be justified by the facts of
the case in granting a prayer like the defendants' fourth, it
was error under the facts of this case to refuse the plaintiff's.
sixth, by which the Court was asked to instruct the jury that
if they should find that at the time the plaintiff acquired the
note it had no notice of any. fraud in the obtention of said note.
or any failure of consideration, *other than the note itself showed*,
the plaintiff was entitled to· recover.    In other words·, such an
instruction would have been equivalent to a declaration by the·
Court that if the endorsements on the paper were the only
suspicious circumstance, or the only evidence to show knowl--
edge of fraud, then such circumstance or evidence was not
legally sufficient to show bad faith and to prevent a recovery
by the plaintiff.    It does appear that even if suspicion had
been aroused by seeing the endorsements upon the notes and
the plaintiff or its officers had made inquiry that any evidence.

of the fraud or failure of consideration or defect in title would
or could have been discovered.   It does appear however
from the evidence that Mr. E. L. Coblentz, one of the officers
of the plaintiff, made inquiry from the agent of the payee as to
the meaning of the endorsements on the note and he' was in-
formed what the circumstances were.   The fraud was not thus
disclosed, nor could it have been discovered by inquiry from
the makers themselves, who were then ignorant of the trick
that had been played upon them by foisting upon them an
animal totally unfit for the purpose for which he was pur-
chased.   Can we reasonably impute bad faith to the plaintiff
merely because its officers saw the endorsements on the paper?
If not, then, when the question of good faith or knowledge of
fraud is submitted to the jury, the plaintiff was entitled to an
instruction like its sixth prayer.   Thus in *Hamilton* v. *Vought*,
34 N. J. Law, 187, the Court say: "When *mala fides* is the
point of inquiry, suspicious circumstances must be of a sub-
stantial character, and if such circumstances do not appear,
the Court should arrest the inquiry.   Under the former prac-
tice, circumstances of slight suspicion would take the case to
the jury; under the present rule the circumstances must be
strong, so that bad faith may be reasonably inferred."   And
again the Court of Appeals of New York in *Cheever* v. *Pitts-
burg R. R. Co.*, *supra*, declares : "The holder's right cannot
be defeated without proof of actual notice of the defect in title
or bad faith on his part evidenced by circumstances."   This
is but the declaration of the same rule set forth in in the 75th
section of Article 13 of our Code, and the same general prin-
ciple which we have already said has been announced in
*Totten* v. *Bucey* and *Williams* v. *Huntington*, *supra*.

In conclusion we will indicate specifically the result of the
foregoing considerations.

*Plaintiff's First Bill of Exceptions.*—This exception related
to the refusal of the Court to allow the witness Coblentz to
answer the question whether the plaintiff bank at the time it
received the note sued on had any knowledge of fraud or fail-
ure of consideration in said note ?   By the action of the Court

in granting plaintiff's first prayer this exception became unimportant, and it was abandoned at the hearing.

Plaintiff's second and last bill of exceptions relates to the action of the Court in granting defendants' fourth prayer and refusing plaintiff's second, third, fourth, fifth and sixth prayers.

It follows from what we have said there was error in granting defendants' fourth, and in refusing to grant plaintiff's third, fourth and sixth, if under the facts of the case the defendants' fourth could have been properly granted.    Plaintiff's fifth submits to jury the question of the knowledge of fraud and failure of consideration, &c., but this question was withdrawn from the jury and the prayer was properly rejected.

The defendants' first bill of exception we have already considered.    It related to the effect of the release of Dr. Downey. Defendants' second bill of exception related to the prayer they offered at close of plaintiff's case.  This exception was waived. Defendants' third bill of exception related to the exclusion of certain testimony which was supplied by other witnesses.

The fourth bill of exception of defendants' was taken to refusal to allow several witnesses to testify in reference to certain dealings had by them in relation to the note sued on, but counsel refused to offer to show that the plaintiff had *notice of these transactions.*    We think clearly there was no error in this ruling.

*Defendants' fifth bill of exceptions.*  This exception calls in question the rulings upon the prayers, namely the granting of the plaintiff's first and the rejection of the defendants' prayers with the exception of the fourth which was granted.

From what we have already said it will be seen that we are of opinion that the first prayer of the plaintiff was as the case is now presented properly granted.    It also, of course, follows from what we have said that defendants' *first* asking to take the case from the jury and for verdict for the defendants was properly refused.    Defendants' *second* was necessarily refused, if the plaintiff's first could have been properly granted, and we have said it should have been granted.    Defendants' third relates to the release and as we have said was properly refused.

Defendants' fifth was properly refused because it submitted to the jury the question whether the plaintiff took the note with knowledge of fraud and they were instructed properly as we hold by plaintiff's first that there was no legally sufficient evidence of such knowledge.    The defendants' sixth and seventh presented the question as to the legal effect of the release of Dr. Downey which we have already considered.    Defendants' eighth prayer was, we think, properly rejected, if for no other reason because there was no evidence that the signature of Hobbs to the notes was a condition precedent to the liability of the defendants thereon.    Some of the witnesses testified that the understanding was that all who signed the subscription papers were to sign the notes, and others testified their understanding was that they could pay in cash or give notes; but their is nothing either in the testimony or the contract of subscription that there was to be no liability unless all signed the notes.

By reason of the errors indicated the judgment will be reversed and new trial awarded.

*Judgment reversed with costs and new trial awarded.*

(Decided June 30th, 1903.)