## FRANK J. MURPHY vs. GEORGE DOBBIN PENNIMAN et al.—WM. B. THOMAS vs. GEORGE DOBBIN PENNIMAN et al.

*Suit by Person in Representative Capacity Against Himself Individually —Liability of Directors of a Corporation for Negligence in Management of Its Affairs—Sufficiency of Allegations of Bill by Receivers—Multifariousness—Failure of Directors to Attend Meetings —Loans Made in Violation of Charter—Ratification by Directors— Taking Security for Loan to Employee—Jurisdiction of State Court to Appoint Receiver of Insolvent Corporation—National Bankruptcy Act—Settlement by Receiver of Claim Against Some of the Directors Liable—Release by Receiver not Authorized to be Made Under Seal.*

One of the receivers of an insolvent corporation had also been a director of the corporation. A Court of equity directed certain solicitors to institute proceedings in the name of the receivers against the directors to enforce their liability for losses occasioned by their negligence, and a

suit was accordingly instituted in which the said receiver sued himself as one of the directors. Upon demurrer to a bill on the ground that the same person is a party plaintiff and also a party defendant, *held*, that, although it is not proper that a man in his representative capacity should sue himself as an individual, yet, in this case, where the suit is under the control of solicitors appointed by the Court, a demurrer to the bill on that ground should not be sustained.

A bill by receivers of a corporation against its directors to hold them liable for losses alleged that each and all of them permitted the assets of the company to be wasted and its property squandered by culpable negligence; that their acts and omissions were not mere mistakes of judgment, but were inattentions to the duties of their trust and abuse of their authority, and that they had disregarded the charter of the company and the general laws of the State. The bill specified their failure to attend meetings of the board; failure to exercise due diligence in the selection of officers, the making of loans to officers of the company in disregard of the charter, and other wrongful acts. *Held*, that although some of the statements in the bill are conflicting and some parts of it are defective, yet a demurrer to the same must be overruled since it contains sufficient averments to require the defendants to answer.                                    .

A bill by receivers against all of the directors of a corporation who were such from January, 1903, until the receivers were appointed in June, 1903, alleged that all of the defendants were connected with, or responsible for, all the acts complained of as constituting negligence and misfeasance in the discharge of their duty. *Held*, that such bill is not multifarious as joining together independent matters and defendants who have no joint liability.

When the ground of demurrer to a bill in equity is that it combines matters triable by a Court of equity with those triable at law, it must specify what matters are triable only at law.

Directors of a corporation are not required to attend every regular meeting of the board, but they may be liable for losses occasioned through their habitual non-attendance at meetings.

A director is not liable for illegal acts done at a special meeting of the board at which he was not present, unless there be some proof to connect him with the illegal act in addition to his mere absence.

The charter of a banking and trust company provided that no loan should be made to any officer, and that the parties consenting to a loan in violation of this provision shall be liable to the corporation for the amount so loaned and all losses and expenses resulting therefrom. When a loan was made to an officer and afterwards ratified at a meeting of the directors, the mere absence from a meeting of a certain director, cannot be taken as constituting his consent to such loan.

A bill by receivers against directors alleged that certain specified loans

were made to officers of the corporation, in violation of the charter, and that the loans were ratified and approved by the board of directors. One of the defendant directors was present at only some of the meetings at which such loans were approved. The bill alleged that about eighteen per cent of the loans so made resulted in a loss, and alleged that the receivers were able to state the exact amount of the losses resulting from such loans. *Held*, that, as against this defendant, the bill should specify the particular loans which caused loss, in order that he might have notice whether the loans to which he consented, resulted in a loss, and that his demurrer to this part of the bill should be sustained.

If the directors of a corporation take from an officer who has misappropriated its assets, his notes with collateral security for the amount of the defalcation, such a transaction is not a loan to an officer in violation of a provision of the charter prohibiting the making of such loan.

When the directors of a corporation, who consent to the making of a loan to an employee, are declared by the charter to be liable for the amount so loaned and all losses and expenses resulting therefrom, they are liable in equity for the losses and expenses resulting from a prohibited loan, but not for the amount so loaned independent of any actual loss.

The allegation in a bill that each and all of the directors of a corporation after having knowledge that a certain employee had misappropriated its funds, promoted him to a position of greater responsibility which caused great loss to creditors and stockholders, is not open to demurrer by a defendant.

An allegation in a bill that each and all of the directors of a corporation negligently allowed the bond given by its treasurer to lapse, and did not cause the same to be renewed, whereby loss was occasioned, requires an answer from the defendants, and is not demurrable.

A Court of this State has jurisdiction to appoint receivers for a trust and banking company under a bill alleging its insolvency. The National Bankruptcy Act has no application to such company, and that Act does not deprive the State Courts of jurisdiction to appoint receivers to take charge of the assets of an insolvent corporation.

After the institution of a suit by receivers against the directors of a corporation to hold them liable for losses resulting from their misconduct in the management of its affairs, the Court authorized one of the receivers to settle or compromise, a claim against five of the directors upon their payment of a certain sum. The order was passed on a petition alleging that the other defendants were not to be discharged, but the suit was to be prosecuted against them, while all claims against the five making payment or by the other defendants for contribution, should be extinguished by that settlement. The receiver upon payment of the stipulated sum, executed a release to the five directors under seal, but the use of the seal was not authorized by the Court. *Held*, that the seal to the release being authorized, must be treated as of

no effect, and the other defendants are not discharged from liability by reason of such release and settlement.

*Quaere:* Whether one director of a corporation who has been made to respond for losses resulting from the negligence of the board of directors is entitled to enforce contribution from the other directors.

*Decided April 2nd, 1907.*

Appeal from the Circuit Court of Baltimore City (NILES, J.)

The cause was urged before BRISCOE, BOYD, PEARCE, SCHMUCKER and BURKE, JJ.

*Wm. S. Bryan, Jr.,* for F. J. Murphy, appellant.

*James A. C. Bond* and *Francis Neale Park* (with whom was *W. W. Parker* on the brief), for Wm. B. Thomas, appellant.

*Thomas Hughes* and *Clifton Doll Benson,* for the appellees.

BOYD, J., delivered the opinion of the Court.

The bill of complaint was filed in this case in the name of George Dobbin Penniman and Campbell Carrington, receivers of the City Trust and Banking Company, against seventeen of the eighteen directors of that company, who were elected at the annual meeting held on January 14th, 1903. The company was placed in the hands of the receivers on June 6th, 1903, by an order of Circuit Court No. 2, of Baltimore City, on a bill filed by John A. Sheridan Company *et al.,* which, amongst other things, alleged the insolvency of the company, which the answer admitted. The bill in this case alleges that the defendants were all of the directors of the company from the election on January 14th, 1903, excepting one Frank J. Kohler, who left the State in the early part of June, 1903, and whose whereabouts is unkown to the complainants.

Thomas Hughes and Clifton Doll Benson, attorneys, were directed by the Court to institute and conduct, in the name of the receivers, the legal proceedings necessary for the enforcement of the liability of the directors of the company for certain losses, and this bill, as well as another against the di-

rectors elected in 1902, which will be considered in a separate opinion, was accordingly filed by them. Frank J. Murphy, one of the defendants, filed two pleas which were overruled, and Wm. B. Thomas, another defendant, filed demurrers to the bill which were also overruled. Appeals taken by those defendants from the order overruling their pleas and demurrers, respectively, present the questions for our consideration. We will first consider that of Mr. Thomas. There are twelve causes for the demurrers assigned, some of which can be considered together.

1. It will be well to first consider the cause assigned which numbered two. It is that Campbell Carrington is both a party plaintiff and a party defendant, and that his position as defendant is wholly antagonistic, inconsistent and irreconcilable with his position as plaintiff. Mr. Carrington was one of the directors of the company and was also one of the receivers. It is not a practice to be commended, to have a person in his representative capacity sue himself as an individual, especially under such circumstances as this bill discloses. It would generally be better for a receiver so situated to resign, or in case he declined to do that for the Court to remove him, and appoint another, if necessary. For even if a suit be brought in the name of the corporation, the receiver has such control over its books, papers, effects, etc., as to make it very undesirable to continue in that control when a suit, particularly of this character, is being carried on against him. But in this case the Court having jurisdiction of the trust, authorized and directed Messrs. Hughes and Benson to institute and conduct the preceedings in the name of the receivers, and hence although the receivers are the technical plaintiffs of record the solicitors in reality have control over the case. Any interference or obstruction placed in the way of the solicitors by the receivers, or either of them, could be reported to and corrected by the Court having jurisdiction over them, and hence the reason for the rule prohibiting, or at least disapproving of, the same individual being on both sides of the record does not have the same force as it ordinarily would.

Of course, we do not mean to intimate that either of these receivers have acted, or would act, improperly about the suit, as there is no such suggestion in the record, but we are speaking of what might happen under such conditions.    While the practice of a person appearing on both sides of the record was condemned in *Owens* v. *Crow*, 62 Md. 497, it was referred to as one "which has to some extent prevailed," and neither in that case nor in those of *Stein* v. *Stein*, 80 Md. 306, and *Loney* v. *Loney*, 86 Md. 655, did this Court refuse to consider the questions involved by reason of such practice.    Of course such a suit at law would present another question (*Grahame* v. *Harris*, 5 G. & J. 489), but in a Court of equity "where the Court can determine the respective rights of the parties without much regard to whether they appear as plaintiffs or defendants." (15 *Ency. Pl. & Pr.*, 482), the rule is not of such importance as to *require* the Court in all cases to dismiss a bill, or sustain a demurrer to it because such practice has been followed.    The other defendants cannot be injured and we do not deem this a sufficient cause for the demurrer under the circumstances of this case.

2. The *first*, *third* and *fourth* causes assigned are to the whole bill, and may be considered together.    They allege that the bill does not state a case which entitles the plaintiffs to such discovery or relief as is sought against this defendant; that it is vague, indefinite, ambiguous, uncertain and argumentative and does not state with sufficient certainty any fact which would give the plaintiffs cause of complaint against him.

There is no longer any question in this State about the jurisdiction of equity in cases of this character, *Emerson* v. *Gaither*, 103 Md. 564, and cases there cited.    In *Booth* v. *Robinson*, 55 Md. 438, ALVEY, J., in delivering the opinion, said that the cases "all concur in holding that, in equity, the directors are personally liable for the consequences of their frauds or malfeasance, or for some such gross negligence as may amount to a breach of trust, to the damage of the corporation or its stockholders." That principle has been re-

peated in *Fisher* v. *Parr*, 92 Md. 245, and *Emerson* v. *Gaither*, *supra*. There is no charge of fraud against the defendants in this bill and with the possible exception of the charge of making loans to officers and directors, it can hardly be claimed that there is any malfeasance charged, which resulted in loss. So the question really is whether there is such negligence charged against Thomas as makes him responsible, if proven. The bill is undoubtedly very skillfully drawn, although it is difficult to avoid the impression when reading it that some of the allegations have been made in a way that may make them sufficient on demurrer, but will be very difficult to prove. The expression running through the bill of "the said directors, and *each and all of them*" was evidently used to meet one of the questions raised in *Fisher* v. *Parr*, as to whether all of the defendants were charged with the acts of negligence, etc., relied on, but the use of it in some connections would seem to be inappropriate, and to make some of the allegations uncertain, as to the meaning of the pleader. For example in paragraph (7), division (a), the several defendants are left in great uncertainty as to whether they are charged with permitting loose conduct of the affairs of the company by being *absent* from meetings of the board, or by being *present* and taking part in them. Paragraph (8) is in direct conflict with that statement in (7) (a) which alleges "the failure of each and all of said directors to keep in touch with its management by attendance upon meetings of the board," so far as W. F. Wheatly is concerned, for it shows that he attended every meeting during the year 1903, and it also shows that Messrs. Schulze, Pollock, Reitz, Blake and Carrington attended six out of the eight meetings—there being only five *general* and three *special* meetings that year. But while we see this and other apparently conflicting statements, the demurrers we are now considering are to the *whole bill*, and, under the well-established rules of equity practice, cannot be sustained, if there be sufficient in the whole bill to require the defendant to answer, although some parts of it may be defective.

If we are to be governed by the decision of *Fisher* v. *Parr*,

which we must be, it seems clear that the grounds of demurrer now under consideration, being to the whole bill, connot be sustained. The bill alleges that the said directors, and each and all of them, "failed to perform each and every of their official duties to diligently and carefully administer the affairs of the company as they were" bound to do; that "each and all of them permitted the assets of the company to be wasted and the corporate property lost and squandered by negligence so culpable as to amount to a legal breach of trust;" that "their acts and omissions were not mere defaults or mistakes of judgment, but were inattentions to the duties of their trust and abuses of their authority;" that "they failed to do what men of ordinary caution and prudence ought to do to protect the interests of the corporations;" that they disregarded without good cause, not only the charter and by-laws of the company and general laws of the State, which prescribed the limits of their authority, but the ordinary rules and habits of business, by which even fairly prudent men are guided; and many other similar charges. But it does not stop there. It undertakes to make specific the charges of acts of negligence which are alleged to have resulted in great loss to the company. It specifies amongst other things the failure to attend meetings, failure to use due diligence in the selection of subordinate officers and agents, and to watch and scrutinize the acts and doings of the executive officers, agents and fellow directors, abuses of authority and breach of their contractual relations with the company, in wasting the assets and in making loans to officers and directors of the company, in contravention of its charter and by-laws, and alleges many other acts of omission and commission. It goes into considerable detail and as most of the charges are covered by *Fisher* v. *Parr*, they cannot be reached by demurrers to the whole bill. We are therefore of opinion that these causes are not sufficient to authorize the demurrer to be sustained.

3. The *fifth*, *sixth* and *eighth* grounds are that the bill combines and unites separate and distinct demands against the defendant, and improperly joins wholly independent matters;

that it joins the defendant with other defendants with whom he has no concern and no joint liability, as appears by the complainant's own showing. These present the question as to whether the bill is multifarious. But there can be no doubt that the bill charges *the defendant* with responsibility for these acts alleged. All of the defendants, according to the allegations, were directors from the election of January 14th, 1903, until the receivers were appointed. The case therefore differs materially in that respect from *Emerson* v. *Gaither.* In that case there were seventeen defendants, five of whom were directors from January 1st, 1898, to December 22nd, 1900, when the bank closed, while the others served for different periods of that time. Some of the loans resulting in losses were not made until after some of the defendants ceased to be directors, others before some of them became such, and there were thirty separate and distinct transactions relied on. The bill failed to show that some of the defendants were in any way connected with or responsible for many of those transactions, or that others had anything to do with other acts alleged. That bill was clearly multifarious as to the defendants whose demurrers we sustained, but we overruled that of Joshua Horner on the distinct ground that he had been a director throughout the period involved in that case, from January 1st, 1898, to the failure of the bank. We said; "Mr. Horner and some others were directors from the organization of the bank to the day it failed. We do not think that such of the defendants can complain by reason of there being so many different causes of action alleged in the bill, as all of them are more or less connected and related to the same general question, the negligence and misconduct of the directors in the discharge of their duties from January 1st, 1898, to December 22nd, 1900, when the bank closed." That applies to all of these defendants (excepting in so far as hereinafter stated), and in this bill it was distinctly alleged that *all of them* were connected with or in some way responsible for *all* of the acts complained of, some by acts of commission and others of omission, failure to discharge the duties which they

had assumed as directors.   We therefore are of the opinion
that the fifth, sixth and eighth causes assigned are insufficient
to sustain the demurrer.

4. The *seventh* ground alleges that the bill combines matters
triable and determinable by a Court of equity with those tri-
able and determinable at law.   It is only necessary to say
that if that be a ground for demurrer, it should specify what
is alleged to be only triable and determinable at law.   In
short, the demurrer should have been aimed at those matters,
and not at the whole bill because it contains them, although
the demurrer admits that there are other matters within the
jurisdiction of a Court of equity.

5. The *ninth* ground is that in the 18th and 19th para-
graphs certain matters are alleged which, if they give com-
plainants cause of complaint, are matters of complaint against
the other defendants, but not against him, nor of relief
against him, and the tenth ground is that these paragraphs
allege certain matters which, if they give any cause of com-
plaint against the defendant, are triable and determinable at
law and ought not to be inquired of by this Court.

The 18th paragraph sets out sec. 7 of the charter of the
company which authorized it, amongst other things, to deal in
notes, loans and bonds, and concludes: "provided, that no
loan shall be made directly or indirectly to any officer or em-
ployee of the said corporation; and for any violation of this
provision, the party or parties consenting thereto, directly or
indirectly, shall be liable to said corporation for the amount
so loaned and all losses or expenses that may result therefrom;"
the 19th paragraph alleges that at various and frequent times
divers loans were made through the executive committee "with
the sanction and approval of its board of directors, and each
and every of its directors, and in direct violation of its char-
ter and by-laws and that all the aforesaid directors had con-
structive, if not actual, notice of the said loans, and are in
consequence chargeable and responsible therefor."   It alleges
that the loans were never fully paid, but still continue as a loss
to the company to the extent of $22,378.48.   It then sets out

a number of loans made by the executive committee, and in each instance those of the directors present when the loans were made are stated, and it is alleged that they were ratified and approved at the next succeeding meeting of the board of directors and the members of the board present are named. Mr. Thomas was not alleged to have been present at the board meetings excepting when one loan of $2,500 to Pollock was ratified and approved.

Then under head of "Loans made by the Board of· Directors" it is alleged that on February 1st, 1903, or thereabouts, " loans were made to Frank J. Kohler, who was treasurer of the company, amounting to $50,000 at a special meeting of the board, and those present are named. It then alleges that they were ratified and approved at the next succeeding regular meeting of the board held February 11th and those then present are named. In neither instance was Mr. Thomas present.

Then follows a list of "Loans made by president and treasurer," and the names of those present when they were made, as well as all the directors present at subsequent meetings of the board when they were ratified and approved. Thomas was present when two of those were ratified and approved. Six loans are alleged to have been made to Cochran and Stevens amounting to $25,400 which were endorsed by Frank J. Kohler as security and ratified and approved February 11th, when Thomas was not present. Two on February 14th to Baltimore Building and Construction Company of $2,550 and $5,000 and one on March 7th of $2,550 which were endorsed by Robert H. Pollock, a director, and Frank Kohler, who was treasurer, which were approved on March 11th when Thomas was present. It is then alleged that other illegal and improper loans and investments of funds were made in violation of the charter and in disregard of their duty as directors, the particulars of which the complainants have not been able to ascertain with such certainty as to warrant them setting them forth at length, but they allege that great loss was occasioned by reason thereof.

The loans thus specified in paragraph (19) amount to $127,-400, out of which the plaintiffs only claim there is still due $22,378.45—less then 18 per centum of the whole. Inasmuch as the bill undertakes to give, to the very cent, the amount of alleged loss on these loans, it is difficult to understand why it did not specify the particular loans that caused that loss. It might work great hardship on Mr. Thomas, as well as other defendants, to withhold from them the knowledge that the plaintiffs must have, if they correctly state the precise sum lost and thereby require them to defend loans amounting to $127,400 instead of only those by which the loss is alleged to have been incurred. Such practice should not be permitted by a Court of equity in a case where the liability of defendants depends not upon the provisions of a statute alone, but, so far as Mr. Thomas is concerned, merely upon his alleged negligence, in not attending meetings of the board, and especially when the bill shows on its face that the plaintiffs rely on the *constructive* notice of the loans to such of the defendants as did not have *actual* notice. For that reason alone we would feel called upon to hold the 19th paragraph bad on demurrer, but that is by no means the only ground for so holding it.

The alleged loans of $50,000 to Frank J. Kohler on February 1st, 1903, "or thereabouts," were made at a *special meeting* of the board, at which, the bill shows, Thomas was not present. Conceding, as we must, under the decision in *Fisher* v. *Parr* and other authorities, that directors may be liable for losses occurring through their habitual non-attendance of meetings of the board, the principle should not be carried to the extent of holding a director (especially one living at a distance from where the company's business is conducted) liable for what occurred at a special meeting, at which he was not present, unless there be some allegation (and proof when evidence is taken), to connect him with the illegal acts beyond his mere absence. We are not willing to give our approval of any doctrine that would require directors to attend every· regular meeting of the board, much less

every special meeting.    If such principle is announced as the law of this State it will be impossible in many cases to obtain responsible persons as directors.    In the city of Baltimore it is doubtless true that financial institutions have often had the benefit of the advice and aid of the most competent men in the city, for little or no compensation, although their holdings of stock were small as compared with other stockholders, but such men would hesitate to continue as directors in such institutions, if they are to be held responsible for such losses as are alleged in this paragraph, on the theory of this bill.    We do not mean to intimate that directors should be free from liability simply because they were not present at a meeting of the board when some unlawful or improper act was done, which resulted in loss to the company, if it was their duty to be there, and their absence in any way caused the loss, nor do we mean to say that there may not be cases in which the burden would be on the directors to allege and prove sufficient excuse for non-attendance, although the bill does not specifically allege the contrary, but we do say that there is nothing in this bill, as to these loans, which shows that W. B. Thomas was "consenting thereto, directly or indirectly," to use the language of the charter.    Certainly his absence from a special meeting, of which it is not alleged or suggested that he had notice, which the by-laws expressly require, was not sufficient, and his mere absence from the next succeeding regular meeting (February 11th), at which it is alleged that the loans were ratified and approved were not sufficient to show his consent, as contemplated by the charter. As the bill affirmatively shows he was not present on either occasion, there must be some allegation to show his consent, directly or indirectly, and his mere absence from the meeting, if it be assumed he had notice, cannot be fairly said to be "consenting thereto, directly or indirectly," to an act for which the statute imposes a penalty on parties so consenting.

The bill does not disclose the effect of the loans being subsequently "ratified and approved" at a regular meeting.    It is not easy to see how that could have caused any loss to the

company, for if Kohler got $50,000 on February 1st, the subsequent approval or disapproval of it would in all probability have been of little consequence, as Kohler already had the money, but assuming that it did in some way cause some loss, we are of the opinion that Thomas' absence from that meeting does not make him liable, under that provision of the charter, as it cannot be properly so construed. We have not thought it necessary to refer to the fact that February 11th, was the first regular meeting after the organization for 1903. It would be extending the doctrine of requiring the attendance of directors very far to hold one responsible for such a statutory liability for non-attendance on that occasion.

There is another matter suggested, although not very clearly shown by the bill, with reference to this $50,000 which would relieve the directors of any responsibility for loss on account of that sum if the facts are as they appear in the bill to be. The date and names of those present at the time of this loan are the same as those set out in paragragh (12), where it is alleged that it was agreed to accept notes of Kohler for $78,000 with certain securities as collateral, in satisfaction of his admitted misappropriations of the assets of the company, and that the receivers realized upon those securities a sum not exceeding $50,000, there being a large balance still due and owing by Kohler. If the $50,000 of loans referred to in paragraph (19) be part of those mentioned in (12), as they seem to be from what is stated in the bill, surely there can be no principle of justice or equity which would hold the directors who made that settlement responsible, under the provisions of the charter forbidding loans to officers or employees—much less any of them who were not present. They could not properly be said to be "loans" within the meaning of that section. If as the bill alleges, Kohler had misappropriated $78,000 of the company's assets, can it be that the directors could not take his notes, with collateral security, for the purpose—not of making loans to him, but of securing the company? If they had the opportunity to thereby secure the company, and had neglected to do so, would not this bill have charged them with such

neglect? It certainly could have justly done so, unless it were shown to have been within their discretion, to determine whether or not it was best for the company. This may be illustrated by the law applicable to national banks. They cannot make loans on real estate, but it is very generally, if not universally, held that a national bank may take a mortgage on real estate to secure a loan previously made. Of course a corporation would not be permitted to evade the provisions by permitting officers to take the funds of the company and then afterwards give notes to secure them, but this bill shows that Kohler appropriated the assets of the company without any authority from it or any of its officers. It alleges that he acknowledged "the defalcations" and offered to give, and it was agreed to accept, "the personal notes of the said Kohler dated February 3rd and 7th and aggregating $78,000 with certain securities as collateral in satisfaction of his said misappropriations." If then the loans of $50,000 referred to in paragraph (19) were a part of these notes, the directors could not be held liable, under its charter, for making *loans* to Kohler, but they were simply doing their duty, in endeavoring to secure the company against his defalcations.

So without determining whether the alleged loans to Cochrane and Stevens, endorsed by Kohler, and those to the Baltimore Building and Construction Company, endorsed by Pollock and Kohler, referred to in this paragraph could be held to be loans within this section of the charter, as the bill gives very little information about them, they were loans of at least $50,000 out of the $127,400 for which the defendant could not be held, yet the bill does not show on which of the loans the losses amounting to $22,378.45 were incurred, as it should, and the demurrer to the 19th paragraph should have been sustained, as presented by the 9th ground stated in the demurrer.

We think the 10th ground was properly overruled as "the losses and expenses" incurred could be recovered in equity, if at all, although not "the amount so loaned," independent of actual losses and expenses, as that would be a mere penalty. *Fisher* v. *Parr, supra.*

6. The *eleventh* ground of demurrer alleges that paragraphs 11, 12, 13 and 14 do not give the complainants any cause of complaint against the defendant or of relief against him. We have already said sufficient about the $78,000 to indicate our views on those alleged loans, but, regardless of any responsibility for them, the bill alleged in paragraph (12) that "the aforesaid settlement with the said Kohler on account of his appropriations of the funds of the company made by and with the connivance and through the procurement of the said directors, each and all of them, of the said company  *  *  was only · a colorable and simulated repayment of the corporate funds  *  *  and taking Kohler's notes was only a shift and device to conceal the waste of the said assets by an officer of the company, made possible by a breach of duty of its aforesaid directors in failing to use due diligence in the supervision of the company's affairs and the acts of its officers and agents." It then alleges (13) that the defendants, each and all of them, with the knowledge of the manner of squandering the assets of the company by said Kohler, continued him in actual control and management of the affairs of the company, as its treasurer, and afterwards on May 23rd, 1903, he was promoted to the position then created of fourth vice president and assistant to the president, which was a position of greater responsibility than that which he had previously · occupied. That in the latter position Kohler continued to act. "That the aforesaid manner of dealing by the said Kohler, made possible and acquiesced in by the said directors, each and all of them, was one of the causes of ultimately wrecking the said company and causing great loss to its creditors and stockholders." It then alleges in (14) a large number of losses through Kohler, subsequent to the settlement with him for his previous misappropriations, which are set out in the bill. Whether or not they, or any of them, are in fact such as the defendant Thomas is responsible for can only be determined by evidence, but the allegations in the bill are sufficient to require an answer, for, if he be not liable for any of the $78,000 the bill alleges such knowledge on his part of Kohler's con-

duct to require an explanation of the subsequent alleged losses. This ground of demurrer (11) was therefore properly overruled.

7. The next ground (12) is that the bill by its 16th and 17th paragraphs seeks to hold the defendants liable for the amount of Kohler's bond for $20,000, on which the United States Fidelity and Guaranty company was security, although the bill shows on its face that it was not enforceable by the company. It is alleged in paragraph (17) that the bond expired on April 15th 1903, and that the directors, each and all of them, as a result of their negligence, in violation of their trust, in breach of their duty and with want of due care in supervising the acts of their officers and agents, failed to renew the bond as required by the by-laws and negligently allowed it to lapse and become void. Knowledge on the part of each of the directors of the many and large misappropriations of Kohler is alleged, and it is charged that they negligently failed to make, or cause to be made, demand upon the bonding company "as they should and as they had a right to do under the terms of the said bond," etc. Whether or not in point of fact the bond was discharged of all obligations it was liable for, by the settlement in February, can only be determined by evidence, but the bill alleges it was still liable for misappropriations of Kohler and that the defendants allowed it to lapse. There is therefore sufficient in this paragraph to require an answer.

Our conclusions on the demurrers are that there was error in not sustaining the one to paragraph (19) for reasons we have stated, but the others were properly overruled. Whether or not the allegations of the bill or any of them, can be sustained can only be determined after the evidence is taken, and the case will require extraordinary care to see that no injustice is done, as there are so many defendants and so many different transactions involved, but the charges are such as to require the defendants to answer and to give the plaintiffs an opportunity to offer testimony in support of them.

8. We will now consider the pleas of Frank J. Murphy. The

first is to the effect that inasmuch as the receivers were appointed under a bill alleging insolvency and an answer admitting it (under secs. 376 and 377 of Art. 23 of Code), and the National Bankrupt Act was in force, the Court was without jurisdiction to entertain the bill and appoint receivers. The Bankrupt Act did not in our opinion in any way interfere with the action of the Court. In the first place we held in *Old Town Bank* v. *McCormick*, 96 Md. 341, that the State Insolvent Law remained operative as to cases or classes of person which are not provided for by the Bankrupt Law, and that when that law provides that a certain class of persons may apply voluntarily for its benefit, but that such class should not be adjudged involuntary bankrupts, the involuntary feature of the State Insolvent Law as to them remains in force, because not in conflict with the Bankrupt Act. By sub-division B of sec. 4 of the Bankrupt Law, as amended by Act of 1903, amongst those subject to involuntary bankruptcy proceedings, is "any corporation engaged principally in manufacturing, trading, printing, publishing, mining or mercantile business;" and the section concludes; "Private bankers, but not national banks or banks incorporated under State or Territorial laws, may be adjudged involuntary bankrupts." The amendment of 1903 simply added the word "mining" to the Act of 1898. Without determining whether this company would be deemed a "bank" within the meaning of that provision, it seems clear that it does not come within either of the corporations named as liable to the involuntary proceedings in bankruptcy. This Act is not as broad as that of 1867 in respect to corporations. *Gould and Blakemore on Bankruptcy*, pp. 18–22; 5 *Cyc.*, 283.

Then in *Mowen* v. *Nitsch*, 103 Md. 685, we had occasion to refer to the Act of 1896, ch. 349, now sec. 377 of Art. 23 of the Code, and said that prior to that Act "a corporation was not in any respect within the scope of the State insolvent laws, *nor is it yet amenable to that system;* but since the adoption of the Act and on the terms therein prescribed, all corporations, other than railroad companies, upon appropriate proceedings against them *in a Court of equity*, are brought within the operation of

a provision of that system (*but not under the system itself*), in so far forth only as respects the preference of one creditor over another when the corporation is insolvent," and while secs. 376 and 377 of Art. 23 do refer to insolvent corporations, and the proceedings are based on their insolvency, the Bankrupt Act, and decisions concerning it, would have to be given great latitude, to prohibit a State Court from appointing receivers of a corporation, and dissolving it, even if it was one included by that Act, especially when as in this case, no proceedings in bankruptcy had been instituted against the corporation. The present Bankruptcy Act never contemplated prohibiting a State Court from dissolving one of its own corporations which had become insolvent. Sec. 376 of Art. 23 makes no provision for setting aside preferences and it was not until what is now sec. 377 was passed that our equity Courts had such jurisdiction as is therein conferred on them. This case is a good illustration of the results that might follow the construction contended for. There were no proceedings against this company, within the time required by the Bankrupt Act, and if the State Court had no jurisdiction to appoint receivers and take charge of its assets, the little that was left on June 6th, 1903, might have been wasted. We are therefore of opinion that this plea was properly overruled, because the National Bankrupt Act had no application to this company, and if it had, it does not take away the jurisdiction of the State Courts to appoint receivers to take charge of, collect and recover the assets of an insolvent corporation—certainly not when there has been no proceedings in bankruptcy against the corporation.

9. The second plea presents this question: Did the release *under seal* to five of the defendants by one of the receivers, after the bill was filed (the receivers being authorized by order of Court to enter into settlement and compromise as set forth in a petition filed with the Court), have the effect of discharging the other defendants? As Mr. Carrington, the other receiver, was also a defendant and was one of the five to be released, the petition was filed by Mr. Penniman. It in substance stated that he and his counsel were of the opinion that

the proposed settlement of $3,000 would be beneficial to the estate, by reason of the financial condition of those five defendants; that it was to be made on the distinct understanding that the other defendants were not to be discharged, but the plaintiffs would prosecute the suits to a decree, as if the settlement had not been made; that all claims against the five by the receivers, or by the other defendants for contribution, should be extinguished by payment of said sum, and if it be held that the other directors have the right of contribution against them, then to the extent of such right the settlement should operate to release the other directors from the liability imposed on them by said decree, and in like manner extinguish the liability of the five settled with. It concludes "it being further understood that this agreement is to be treated as if made subsequent to such order or decree and such adjustment of liability as among the directors themselves, although the money called for by the present settlement is to be paid at once."

If the release relied on be a technical, valid release the effect of it would seem to be well settled in this State. In *Gunther* v. *Lee*, 45 Md. 60, it was said by ALVEY, J., that: "All the cases both English and American, maintain the doctrine that satisfaction from one joint tort-feasor, whether received before or after recovery, extinguishes the rights as against the others. * * * And as a consideration is always implied in a release under seal, though not expressed on its face, the release by deed of one joint trespasser will discharge all; and this has been the law from very early times." Then in that case it was further decided that: "The proviso in the release, by which the right to recover for the same injury against the other two defendants was attempted to be reserved to the plaintiffs, is simply void, as being repugnant to the legal effect and operation of the release itself." In *Berkley* v. *Wilson*, 87 Md. 219, we held that if an injured party had recovered judgment against one of several tort-feasors, *which has been paid or tendered*, he cannot maintain an action against another tort-feasor for the same injury. In *Abb* v. *North. Pac. R. R. Co.*, 58 L. R. A. 293, there is a very full and excellent note on the

"effect of release of one joint tort-feasor on liability of the other," and the summary of the note is not only in accord with the principles announced in *Gunther* v. *Lee*, but states what is a very just rule to be adopted when the release is not under seal and it is shown that the intention was not to discharge the other tort-feasors. We have a number of cases in this State relating to the release of one of a number of joint debtors, among the latest of which are *State* v. *Gott*, 44 Md. 341; *Valley Bank* v. *Mercer*, 97 Md. 458, and *Commercial Bank* v. *McCormick*, *Ibid* 703, but as appellant so contends we will assume that this bill treats the defendants as tortfeasors, as it certainly does as to most, if not all, of the claims.

The copy of the release in the printed record has no seal after Mr. Penniman's name, but as both sides treated it at the argument as if it was under seal, we suppose it is so in the original. But it is manifest that the Court never intended the receivers, or either of them, to execute a paper which would have the effect now claimed for this, and hence neither intended nor authorized the execution of a release *under seal*. The receivers were authorized "to enter into the settlement and compromise set forth in the aforegoing agreement on the terms and conditions herein set forth," by an order written on the petition signed by Mr. Penniman and which referred to that petition. The petition shows distinctly that the right to proceed against the other defendants was expressly reserved and it is clear that a release under seal was not authorized or contemplated by the Court. "The Court itself has the care of the property, by its receiver, and that officer, being the mere creature of the Court, has no power other than those conferred upon him by the Court, or derived from its established practice." *Gaither* v. *Stockbridge, Receiver*, 67 Md. 224. The order of the Court in this case, in appointing the receivers, uses the same language in substance as that used in *Gaither* v. *Stockbridge*. It is clear therefore that a release under seal (if it must be given the effect claimed by appellant) was not only *not* authorized, but was in effect prohibited, as the settlement was to be made on terms altogether different

from that, and hence must be treated as of no effect, as any unauthorized act of a receiver would be, unless afterwards sanctioned by the Court. The release under seal not being effective, there can be no reason why a Court of equity should be required to give an effect to the settlement that is directly contrary to that intended, and in terms attempted to be guarded against. This is not like a case of several joint tort-feasors being sued for an injury done by them, such as a suit for assault and battery, slander, injury to the person, etc. In such case a settlement by one may release the other because if the injured party has been compensated once he cannot be again, and especially in cases where punitive or other damages not fixed can be recovered, it would oftentimes be difficult, if not impossible, to show with any certainty that the settlement did not include all damages sustained. But in a case such as this the losses, if any, can be accurately, ascertained. For example, if the defendants are liable for losses by reason of unlawful loans, the liability being once established, the amount can be definitely fixed, and they cannot be held for damages beyond the actual losses caused by their acts of omission or commission. In this connection we might add that although it is assumed by the appellant that there can be no contribution between directors in such cases, we do not understand the authorities to be by any means settled to that effect, if there be no positive wrong involving a guilty scienter but tho wrong consists of mere negligence and inattention. While there are cases deciding that there can be no contribution, there are many excellent authorities to the contrary. See 10 *Cyc.*, 897; 3 *Am. & Eng. Dec. in Eq.*, 205; 5 *Ibid*, 426, and cases cited in them. It is not necessary to now determine that question but we cannot admit that the weight of authority is clearly against contribution between directors, and it is undoubtedly true that in this class of cases directors are not in all respects treated as ordinary tort-feasors.

We are then of the opinion that the settlement made did not have the effect of wholly discharging the other defendants, but in the event of any decree against them, they must

be credited with such portion of the amount paid by the five directors as they may in law, and under the terms of the agreement of settlement, be entitled to. See *Abb* v. *North Pac. R. R. Co.*, *supra*, (summary of note). If however, it be shown to the Court below that the money was paid by the five directors on the understanding by them that a release under seal was to be executed, it could consider an application of those five to have the money returned, and let the case proceed as if such an arrangement had not been entered into. Of course that should only be granted if the Court be satisfied that the money was paid on the distinct understanding that the release *under seal* was to be given them. We think this conclusion not only in accordance with well considered authorities, but especially applicable to a proceeding of this character. It may not be out of place to suggest that inasmuch as a settlement has been authorized to be made with those who were probably most responsible for some, if not all, of the conditions complained of in the bill, it would only be just and proper to allow a settlement with the other defendants, if a reasonable one can be made, and thereby save the estate from further costs and possibly additional loss.

For reasons given we will affirm the order, in so far as it overruled the pleas of the defendant Murphy.

> *Order overruling demurrers and pleas affirmed, excepting in so far as it overruled the demurrer to the nineteenth (19th) paragraph of the bill, and order reversed as to that, and cause remanded for further proceedings. One-fourth of the costs in this Court to be paid by Frank J. Murphy, one-fourth by Wm. B. Thomas, and the remainder by the receivers out of the estate, the costs below abide the result of the suit.*