BARRE TRUST COMPANY *v.* FRANK S. LADD ET UX.

October Term, 1930.

Present: POWERS, C. J., SLACK, MOULTON, WILLCOX, and THOMPSON, JJ.

Opinion filed May 5, 1931.

*Deane C. Davis* and *John W. Gordon* for the plaintiff.

*F. L. Laird, H. C. Shurtleff,* and *W. E. Miller* for the defendants.

THOMPSON, J. The plaintiff seeks to recover on a demand promissory note for five thousand dollars, executed by the defendants, who are husband and wife, dated May 11, 1929, payable to the order of George B. Littlefield, and indorsed by him to the plaintiff. There was a trial by jury, and a verdict for the defendants. The plaintiff excepted.

The defendants filed three pleas. The first plea alleges that the note was obtained from them without consideration.

The substance of the third plea is that the defendants were induced to execute and deliver the note in question by the false and fraudulent representations made to them by said George B. Littlefield, "that they were to receive therefor five thousand dollars worth of the capital stock of the Littlefield Piano Company, Incorporated, and upon the further misrepresentation that said stock was good and valid and worth the full value of said note and that some of the biggest men in Barre, Vermont, were purchasing such stock and felt sure of it, and that said corporation was doing a large volume of business around $150,000 per year." It is further alleged in the plea that said representations were false; that they believed them, and were thereby induced to execute said note; "that none of such stock, such as it was, was ever delivered to them in consideration for said note as was then and there agreed."

The second plea is the same as the third except that it alleges that the note was obtained from the defendants "by the plaintiff and others in collusion with it for its benefit by fraud and misrepresentation"; and that they "were induced thereby to sign and deliver said note to the plaintiff." There is no allegation of a *scienter* in either of the pleas.

The plaintiff did not demur to the pleas, but filed a replication containing eight paragraphs. The substance of the replication is that the plaintiff had no knowledge that there was a lack of consideration in the note nor that it was procured by said Littlefield by fraud and misrepresentation, and that it had no part in procuring the note from the defendants. It does not admit nor deny that Littlefield procured the note by the false representations set forth in the pleas, but puts the defendants to their proof of the same, and alleges that whether such statements were made as in the answer alleged or not is immaterial "for the plaintiff denies that it had any knowledge of any false representation above stated but the plaintiff did suppose that it was a note for stock in said company. It denies that it knew or understood that said Littlefield and said Littlefield Piano Company were insolvent at the time it received the note and denies that said note could not have been obtained by said Littlefield by fraud and misrepresentation. It denies that it did not take said note in good faith and for value, and alleges "that said note was taken in due course of business, in good

faith and for value and without notice of any infirmity in said note or defect in the title of said Littlefield.''

At the close of all the evidence the plaintiff made a motion for a directed verdict, and in connection with the same, it made separate motions that the court withdraw from the consideration of the jury the several allegations in the pleas setting forth the defense of the defendants. The substance of these motions will be stated later. All of the motions, including the motion for a directed verdict, were overruled, and the plaintiff was allowed its exceptions on all grounds it had asked for.

It fairly appears from the evidence, viewed in the light most favorable to the defendants, that the Littlefield Piano Company, Incorporated, hereinafter called the Piano Company, was a Vermont corporation engaged in selling pianos and other musical instruments, with its principal place of business in Barre City. George B. Littlefield was its president and largest stockholder. He personally managed and controlled the business of the Piano Company, and transacted all of its business with the plaintiff, and with the Commercial Finance Corporation, hereinafter mentioned. The Piano Company was incorporated in 1922 with a capital stock of $9,000. In 1926 the capital stock was increased to $50,000, and in March, 1929, to $200,000. It did a large business, but most of its stock in trade was purchased on credit, and sold on credit, it taking lien notes or other security to secure the purchase price of the same. It either sold its secured paper or pledged the same to obtain money to carry on its business.

After the Piano Company was incorporated, Harry Daniels of East Montpelier loaned it money on security or bought its secured paper. In December, 1926, he organized the Commercial Finance Corporation, of which he is president, and thereafter the Corporation bought a large number of the lien notes of the Piano Company on the condition that it collect the payments on the notes as they fell due and pay the money to the Finance Corporation. It also loaned the Piano Company money on open account or secured by mortgage.

Mr. Daniels was a witness for the defendant, and his testimony is not contradicted. He testified that he was familiar with the affairs of the Piano Company, but not so familiar as he ought to have been; that during a period of time from March, 1929, to May 13, 1929 (the day the defendants executed

the note in suit), Mr. Littlefield collected or raised $30,000 on the securities of the Piano Company owned by the Commercial Finance Corporation which he never turned over to it; that during that period he examined the condition of the Piano Company to see if there was any way he could get more security, but he was unable to find any; that about May 13, 1929, so far as he could ascertain, it was questionable whether the Piano Company had any working capital; that its liabilities were about $210,000, and "it had about $190,000 of paper, but there was about $50,000 worth of it that hadn't had any payments on it for six months. I didn't think that looked very good"; that, on May 13, 1929, in his opinion, the capital stock of the Piano Company had "no value unless it be for purposes of control temporarily."

There is no evidence in the case tending to show that the Piano Company was solvent, or that its capital stock had any value, during the period of time in question.

It also appears from the evidence that the Piano Company was adjudged a bankrupt December 21, 1929; that its assets which were not pledged or mortgaged were appraised at $13,555.62, with a disputed item of $1,000; and that there was no equity in the assets which had been pledged or mortgaged as security.

It further appears from the tax inventory of the Piano Company that on April 1, 1929, its taxable property was appraised at $16,000.

The defendants are farmers and live on a large farm in Orange which is owned by Mrs. Ladd. They were friends of Mr. and Mrs. Littlefield, and the Littlefields visited them frequently.

In March or April, 1929, Mr. Littlefield attempted to raise $50,000 by selling capital stock of the Piano Company to his friends. On May 13, 1929, he went to the defendants' farm and sold them $5,000 of the stock for which they gave him the note in suit. He had a paper with him that purported to show the names of the people who had subscribed for the stock and the amount each had agreed to take.

Among the names, and the amount each had agreed to take, were Judge W. H. Scott, "about $15,000," Kenneth Gale, $5,000, G. L. and Alma Woodworth, $16,500, some people by the name of Blackhall, $10,000, and Frank E. Langley. All of

these people lived in Barre except the Blackhalls. The statement on the paper of the amount of stock Judge Scott and Mr. Gale had agreed to buy was false. It did not appear on the paper how much stock Mr. Langley had subscribed for. Mr. Langley at that time was, and now is, the owner of the *Barre Daily Times* and the president of the plaintiff. The defendants knew him and knew that he was the president of the plaintiff.

To induce the defendants to buy the stock, Mr. Littlefield told them that it was perfectly sound and good; that some of the biggest men in Barre were buying it and he showed them the above-mentioned paper with the names of those who had subscribed for the stock. His attention was called to the fact that the amount Mr. Langley was going to buy was not on the paper, and he told them that Mr. Langley was going to buy "what he lacked of selling $50,000 worth." He also told them that the Piano Company was doing a prosperous business; that it did a business of $100,000 the first year, and of $150,000 for the year ending May 1, 1929. The defendants believed and relied upon these representations of Mr. Littlefield and bought the stock. Mr. Littlefield produced the note in suit, which is on one of the plaintiff's printed notes. It was filled out except for the signatures, and there were two crosses opposite the places for signatures. It bore the date of May 11, 1929. Before the defendants signed it Mr. Littlefield crossed out the name of the plaintiff as payee and wrote in his own name. Mr. Littlefield knew that Mrs. Ladd owned the farm and wanted her to sign the note. She hesitated about signing it, and he told her that the stock was good and that she was taking no chances. She believed him and signed it. The defendants did not know that the note was going to be transferred to the plaintiff, although Mr. Ladd knew that it might be. They did not know that the plaintiff held the note until they received a notice at a later date to pay interest. Mr. Littlefield told the defendants that they had bought fifty shares of the stock and that he would deliver the certificate for it later, but it was never delivered to them although he promised several times to do so.

In connection with its motion for a directed verdict the plaintiff requested the court to withdraw from the consideration of the jury the allegations of false representations made by

Littlefield in procuring the note from the defendants because there is no allegation in the pleas that Littlefield knew the representations were false when he made them. The pleas contain no allegation of a *scienter*. The plaintiff did not demur to the pleas on this ground, nor did it deny in its replication that Littlefield obtained the note by false representations, but denied that it had any knowledge of the same and put the defendants to their proof of the same if they were material, and it added the gratuitous allegation that it "denies that said note could not have been obtained by said Littlefield except by fraud and misrepresentation."

Before the adoption of the Practice Act (G. L. 1789 *et seq.*), the defense of fraud in the inception of a note in cases of this kind was available under the general issue, but it is now necessary that all matters relied upon as an affirmative defense shall be specially pleaded when the statute does not provide otherwise. *Howard Nat. Bank* v. *Wilson,* 96 Vt. 438, 443, 120 Atl. 889. But the course of the trial may be such as to constitute a waiver of any question respecting the sufficiency of the pleadings to make available a defense not properly pleaded. *Id.* The replication of the plaintiff shows that it was fully informed of the nature of the defense to be made by the defendants, and that it was not harmed by the failure to allege a *scienter* in the pleas.

Two of the essential elements of actionable fraud by false representations are that the representations were false and known to be false by the person making them, or made as of his own knowledge without in fact knowing them to be true. The course of the trial below indicates that the defendants understood the necessity of proving these two elements in making out their defense, as much testimony was introduced by them tending to show the falsity of the representations made to them by Mr. Littlefield, and that he knew they were false. No objection was made to this testimony by the plaintiff on the ground that no *scienter* was alleged in the pleas. We think, under these circumstances, that the plaintiff waived the question of the necessity of an allegation of a *scienter* in the pleas.

The court, after instructing the jury correctly as to the elements constituting actionable fraud and their application to the evidence, said: "Were all of these elements present in the transaction between Mr. Littlefield and Mr. and Mrs. Ladd?

Did Mr. Littlefield make the false statements to Mr. and Mrs. Ladd which are alleged to be false, knowing them to be false, intending thereby to induce the defendants to act upon them, and did the defendants act upon them to their damage, believing them to be true? If so, if you find all these questions answered in the affirmative then fraud has been established.'' No exception was taken by the plaintiff to the charge on the question whether the note was procured from the defendants by the fraud of Mr. Littlefield.

█ The case was tried in all respects as it would have been had a *scienter* been alleged in the pleas; and it being apparent that an amendment alleging a *scienter* would merely make the allegations conform to the proof, such an amendment would be permitted in this Court to avoid a reversal, if the same was necessary. *Wellman* v. *Mead*, 93 Vt. 322, 338, 107 Atl. 396; *Chaffee* v. *Rutland R. R. Co.*, 71 Vt. 384, 45 Atl. 750; *Baker* v. *Sherman & Miller*, 73 Vt. 26, 31, 50 Atl. 633.

█ The plaintiff also moved that the court withdraw from the consideration of the jury the allegation in the first plea that the note was obtained from the defendants by the plaintiff and others in collusion with it, and for its benefit, on the ground that there was no evidence to support the same. This motion should have been granted, and it was error to overrule it. The error, however, was harmless, as the charge of the court was such that this question was not before the jury for consideration.

The court instructed the jury that there were two issues for them to decide: ''First. Was this note obtained by Mr. Littlefield by fraud? and, Second: Is this plaintiff a holder in due course?'' The court enumerated the conditions prescribed by G. L. 2921, necessary to make the plaintiff a holder in due course, *viz.*: (1) That the note was complete and regular on its face; (2) that it became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that it took the note in good faith and for value; and (4) that at the time the note was negotiated to it, it did not have notice of any infirmity in the instrument or defect in the title of the person negotiating it. The jury were told that, so far as the evidence disclosed, the first two conditions had been met by the plaintiff; that if the defendants proved that Mr. Littlefield obtained the note by fraud, as alleged, then the plaintiff must show by a preponderance of the

evidence that it did not have actual knowledge or notice "of the infirmities or defenses here relied upon in defense; nor knowledge of such facts that its action in taking the instrument would amount to bad faith." This charge eliminated completely the question of collusion by the plaintiff and others in procuring the note from the consideration of the jury.

The plaintiff also moved that the question of lack of consideration be withdrawn from the jury because there was a consideration agreement to deliver the stock which had not been performed, and that was simply a breach of contract; and, also, because the misrepresentations that "the stock was good and valid and worth the full value of said note," was a statement of value, which is not an actionable misrepresentation.

The defendants did not base their claim of failure of consideration upon the mere fact that there was never any delivery of the stock, but upon the fact, if it was a fact, that the stock was worthless, and, if it was worthless, and was represented as being of value, then that failure of consideration would constitute an element of fraud to be considered with the other evidence of fraud; and the court so instructed the jury.

The defendants became owners of capital stock of the Piano Company when they purchased the same and gave their note therefor, and they thereby became stockholders in the corporation even though no certificate of the ownership of the stock was issued to them. The issuance of the certificate was immaterial, except as evidence of their ownership of fifty shares in the Company. *Bushnell* v. *Elkins*, 34 Wyo. 495, 245 Pac. 304, 51 A. L. R. 13; *Mechanics' Sav. Bank* v. *Gish,* 200 Iowa, 463, 203 N. W. 687, 692.

As to the second ground of the motion, this Court has held that representations respecting valu,e standing alone, may or may not be fraudulent, depending upon the circumstances of the particular case, and whether fraud was intended is usually, though not always a questnon for the jury. *Belka* v. *Allen,* 82 Vt. 456, 462, 74 Atl. 91; *Crampton* v. *Beedle,* 83 Vt. 287, 298, 75 Atl. 331, 30 L. R. A. (N. S.) 748, Ann. Cas. 1912A, 399; *Arnold* v. *Somers,* 92 Vt. 512, 520, 105 Atl. 260; *Harponola Co.* v. *Wilson,* 96 Vt. 427, 434, 120 Atl. 895; *Fenwick* v. *Sullivan,* 102 Vt. 28, 145 Atl. 258. The evidence in the case warranted a finding by the jury that when Mr. Littlefield procured the note from the defendants, he knew that the Piano Company

was insolvent and that its capital stock was worthless, and that his representations of the value of the stock were made as assertions of fact and were so intended and were so received by the defendants. In such circumstances the question was for the jury.

 The plaintiff further moved that the allegation "that some of the biggest men in Barre were purchasing the stock and felt sure of it," be withdrawn from the jury. The grounds of this motion are, in substance, that some of the business men of Barre did subscribe for the stock of the Piano Company, and that Mr. Littlefield might have honestly believed that they were some of the biggest men in Barre. We will assume that is the fact.

As hereinbefore stated, Mr. Littlefield, in connection with the statement that some of the biggest men in Barre were buying the stock, showed the defendants a paper on which appeared their names and the amount of stock each had agreed to buy. The statement on the paper was false as to Judge Scott and Mr. Gale, as they had agreed to buy a smaller amount of stock than appeared on the paper.

The plaintiff stresses the fact that Mr. Langley bought some of this stock, and that so did Mr. G. L. Woodworth, "a man able to buy $16,500 of the stock and pay therefor." The facts of these two transactions are as follows:

Mr. Littlefield told the defendants that Mr. Langley was going to buy "what he lacked of selling $50,000 worth" of the stock. The fact that Mr. Langley's name appeared on the subscription paper without the amount of stock he was going to take gave credence to this statement, but it was false. Mr. Littlefield tried to sell some of the stock to Mr. Langley. At that time he was owing Mr. Langley over $500 for advertising in his paper. Mr. Langley would not buy any of the stock, but agreed to take about $500 worth of it and apply it upon Mr. Littlefield's account, and he signed the subscription paper. He did not know what Mr. Littlefield did or was going to do with the subscription paper.

G. L. Woodworth owns a business block and a dwelling house on North Main Street in Barre. The Piano Company was a tenant in the business block. He had signed notes with the Piano Company for its accommodation to the amount of $16,500.

One note for $8,500 was held by the plaintiff. The other note was held by another bank.

Mr. Woodworth was a witness for the plaintiff. He testified in direct examination that he subscribed for $16,500 of the stock of the Piano Company and actually took the stock and paid for it; that at that time he considered it a good investment. It developed in his cross-examination that he paid the notes he had signed with the Piano Company and gave his own notes secured by a mortgage on his business block in lieu of the same, and received a certificate for 165 shares of the capital stock of the Piano Company. Before he did this he consulted with Mr. Clark, the treasurer of the plaintiff, and he "thought it would be better for us all if I should buy the stock; they thought if I bought the stock it was a little safer that way than the way the matter was, it would help matters out." He consulted with Mr. Clark because he was in trouble, and the fair inference from his testimony is that his trouble was that he had either been called upon to pay the notes or had learned that he would have to pay them. Mr. Littlefield did not tell the facts of these stock transactions with Mr. Langley and Mr. Woodworth to the defendants, and it can fairly be inferred from the evidence that he induced them to believe that Mr. Langley and Mr. Woodworth were buying the stock and paying cash for the same because "they felt sure of it."

The plaintiff further moved that the court withdraw from the jury the allegation that Mr. Littlefield told the defendants that the Piano Company "was doing a large volume of business of around $150,000 per year." The representation Mr. Littlefield made was that the Piano Company was doing a prosperous business; that it did a business of $100,000 the first year, and of $150,000 for the year ending May 1, 1929. It appears from the sales book of the Piano Company that its sales were $172,875 in 1927, and $118,845 in 1928, and it does not appear that the business increased any the first four months of 1929. The sales for 1927 were evidently somewhat padded as an audit of the business for that year by public accountants showed net sales of $151,175, with a net profit of $821.44. The jury could well find that the representations respecting the business of the Piano Company were in part false.

The court committed no reversible error in overruling the several motions to withdraw the several allegations in the pleas from the consideration of the jury.

The ground for the motion for a directed verdict was that, if the motions to withdraw the allegations in the pleas from the consideration of the jury were granted, no defense was left, and the plaintiff was entitled to a verdict. For the reasons already stated, this motion was properly overruled.

After verdict and before judgment, the plaintiff moved that the verdict be set aside and judgment be entered for it. The motion was overruled, and an exception saved. There are sixteen grounds stated in the motion. The last eight of them cover the grounds of the motions to withdraw the allegations in the pleas from the jury, and it is not necessary to consider them again. The jury found that there was fraud in the inception of the note, and it follows as a matter of law that the title of Mr. Littlefield to the note was defective. G. L. 2924. There is ample evidence to support the finding of the jury.

The only other question submitted to the jury was whether the plaintiff took the note in good faith. The first eight grounds of the motion are directed at this question, but they are all embraced in the second ground, that: ''There is no evidence in the case on which the jury could fairly and reasonably predicate a verdict for the defendants.''

The plaintiff concedes that if there was fraud in the inception of the note, the burden is upon it to prove that it took the note in good faith; and it could not very well do otherwise, as the Negotiable Instruments Act provides that when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title in good faith and without notice of any defect in the title of the person negotiating it; and to constitute notice of any defect in the title of the person negotiating an instrument, the person to whom it is negotiated must have had actual knowledge of the defect or knowledge of such facts that his action in taking the instrument amounted to bad faith. G. L. 2921, 2925, 2928. *Howard Nat. Bank* v. *Wilson, supra,* 96 Vt., page 453, 120 Atl. 889; *Land Finance Corp.* v. *Sherwin,* 101 Vt. 114, 122, 141 Atl. 598; *Harponola Co.* v. *Wilson, supra,* 96 Vt., page 436, 120 Atl. 895.

There is no evidence from which it can be inferred that the plaintiff had actual knowledge of the defect in Mr. Littlefield's title to the note when it took it, so the question is whether it

had knowledge of such facts that its action in taking the note amounted to bad faith. The following facts fairly appear from the evidence, viewed in the light most favorable to the defendants.

The Piano Company did some of its banking business with the plaintiff for several years before it went into bankruptcy. While the directors of the plaintiff saw some of the audits and financial statements of the Piano Company, discussed its account with the plaintiff on various occasions, and approved the note in suit, the actual transaction of its business with the Piano Company was left to M. B. Clark, its treasurer. He and other witnesses who did business with the Piano Company apparently regarded Mr. Littlefield as the Piano Company as they referred constantly to various accounts and transactions of the Piano Company as the personal accounts and transactions of Mr. Littlefield.

In the early part of 1929 the Piano Company was indebted to the plaintiff on indorsed notes and on notes secured by mortgage or by lien notes on pianos as collateral. The amount of this indebtedness did not appear. For several years the Piano Company had a checking account and a savings account with the plaintiff. The savings account was a fund deposited to secure the payment of lien notes held by the plaintiff as collateral, but with the understanding that it could be applied on any account of the Piano Company. The plaintiff had a signed check for the full amount of the account so that it could be applied wherever it was needed. This account was active prior to 1928 and ran as high as $8,000. There were very few changes in it in 1928, and no deposits made in it in 1929. The largest balance in 1928 was $5,569.71, and this balance was carried over into 1929.

There was a third account which was a depository for money collected by Mr. Littlefield on lien notes held by the Commercial Finance Corporation. In 1928 the plaintiff received a written notice from Mr. Littlefield not to honor checks on this account unless they were payable to the Commercial Finance Corporation. This account is not particularly material, except that it appears that in January, 1929, the plaintiff protested a check for $210 which the Piano Company drew to the order of the Commercial Finance Corporation when there were sufficient funds in the account to pay it, and that the

plaintiff claimed that it had the right to apply this account on what the Piano Company owed it. There was a special account opened April 17, 1929, in the name of Mr. Littlefield, in which the proceeds realized from the sale of Piano Company stock by him were deposited. The total deposits in this account were $38,100. It does not appear what was done with all of this deposit, although the plaintiff got at least $18,500 of it.

Mr. Clark testified that the checking account was "practically continually overdrawn" for three years prior to May 13, 1929, although it "was covered up at various times"; that a great many checks and notes of the Piano Company were coming into the plaintiff every day, and they were protested unless Mr. Littlefield "made some arrangements to cover them." We think the jury could well doubt the accuracy of the last part of this testimony when applied to the whole period of overdrafts.

While it can be inferred from Mr. Clark's testimony that Mr. Littlefield made arrangements so that the daily overdrafts were usually paid within twenty-four hours thereafter up to July 6, 1928, it appears from his testimony and the checking account itself that from that date there was a continuous overdraft except during the month of January, 1929. On January 5, 1929, the plaintiff loaned the Piano Company $8,000 on its demand note which was credited on the checking account. On January 10, there was an overdraft of $611. During the remainder of the month there was a small credit balance about half of the time.

From January 28, the daily overdraft steadily increased until it amounted to $11,270 on April 11. On April 16, $5,000 was transferred from the savings account to the checking account. This transfer, with some deposits, reduced the overdraft to $5,536. It steadily increased thereafter until May 10, when it amounted to $10,975. On May 11, $5,000 was transferred from the Littlefield special stock-sale account to the checking account, and on May 15, the proceeds of the note in suit were applied on this account, which reduced the overdraft to $1,686. For sometime prior to May 15, the checking account did not show the true amount of the overdrafts. Mr. Clark testified that the plaintiff paid certain checks which were not entered on the checking account, but were carried in a file; that while the lien notes they held as security for the overdrafts and the savings account and the special account claimed by

the Commercial Finance Corporation were sufficient to cover the overdrafts most of the time, they would not have been sufficient if these other checks had been entered on the checking account. The amount of these checks and the reason why they were not entered on the account does not appear. It also appears that $9,444 of checks and notes were protested in 1929 prior to May 13. Other checks and notes were protested prior to 1929. Mr. Clark testified that he understood that the protested checks and notes were taken care of within a reasonably short time, but there is no evidence to that effect.

It appears from Mr. Clark's testimony that the Piano Company purchased its merchandise on time and issued notes therefor which were continually coming into the plaintiff for collection; that the plaintiff itself did not collect the lien notes of the Piano Company which it held, but left that to Mr. Littlefield; that when money was needed it would let him take a number of notes, and he would go to the Commercial Finance Corporation or to similar concerns in Boston or Philadelphia and raise the money on them. He also knew that the Piano Company was doing business with several other banks.

Mr. Clark learned in the latter part of 1928 that there were duplications of notes, that is, that in some instances more than one lien note was executed on the same piano, and more than one creditor of the Piano Company held a lien note on the same piano. Mr. Clark explained why this did not raise any question in his mind as to Mr. Littlefield's honesty. He also testified that he understood that prior to May 13, 1929, the credit of the Piano Company was good with the wholesale people; that at that time it "was more behind with the local creditors than with the outside creditors." The plaintiff took no lien notes from the Piano Company after May 15, but did take some indorsed notes.

Mr. Clark further testified that Mr. Littlefield talked about selling stock of the Piano Company for about two years prior to 1929. He knew that the Piano Company had never paid any cash dividends, but had paid a stock dividend. Mr. Littlefield showed him the subscription agreement for stock hereinbefore mentioned at different times. It had the same names on it as when it was shown to the defendants, and he understood that Littlefield was selling stock to those people. It has already appeared herein that Clark knew the circumstances under which

Mr. Woodworth took his stock and advised him about the same. It can fairly be inferred from the evidence that the stock was the only security that Mr. Woodworth could get for paying the notes he had signed with the Piano Company. Clark testified that when Woodworth took up the note held by the plaintiff he asked him about the note held at another bank, "and I referred him to his attorney."

Clark testified that Littlefield told him when he brought the note in suit to the plaintiff that the defendants were buying some of the stock, that the note was given in payment for the same, that they were responsible people, and they expected to pay it. No inquiry was made by Clark nor by any one on behalf of the plaintiff as to how the note was obtained from the defendants. The only thing that was considered by the plaintiff in taking the note was the financial responsibility of the defendants.

Early in his cross-examination Mr. Clark testified that when the plaintiff took the note in suit he did not know that the stock of the Piano Company was worthless, and he considered it good. The reason he gave for considering it good was: "I banked on financial statements he (Littlefield) furnished." It appears that Littlefield furnished the plaintiff with audits of the Piano Company made by public accountants and also with financial statements prepared under his direction. In further cross-examination he testified as follows:

"Q. Now Mr. Clark, in view of what you have told the jury today about these protested checks, these protested notes, these overdrafts being carried in the way that they were, didn't it occur to you that the stock in that company wasn't exactly a safe investment? A. We have only had one side of the picture, there were assets represented to us to amply cover by financial statements.

"Q. But in view of what you have told us, it never occurred to you this was an unsafe investment, investment in this stock? A. I banked on financial statements made by responsible auditors, made for the company.

"Q. What responsible auditors? A. I think a man by the name of Heath, Rittenhouse of Boston, and I believe Orris Parker of Montpelier made a written audit."

In redirect examination Mr. Clark produced the audits of Heath and Rittenhouse. No audit by Mr. Parker was produced. The Heath audits were for the years 1923 and 1925. They are not material in our disposition of the case.

The Rittenhouse audit was of the year 1927. It is the only audit that is exhaustive and complete in detail. The balance sheet shows a deficit of $4,246.31. The profit and loss account for the year shows net sales of $151,175.19 with a sales' cost of $101,048.34, and with a net profit of $821.44. Among the expenses was one of interest paid, discount on notes sold, and loss on bad debts of $39,790.35. According to this audit the net worth of the Piano Company at the end of the year was $32,753.69.

Mr. Clark also produced a financial statement of May 31, 1928. It was furnished by Mr. Littlefield and the witness understood it was made under his direction. It was the last audit or statement furnished to the plaintiff before it took the note in suit. It shows that the Piano Company had a surplus of $40,430.42 and a net worth of $85,456.69 on May 31, 1928.

Mr. Clark testified about these audits and statements as follows:

"Q. Now did you in this business rely upon these various balance sheets and audits. A. We did.

"Q. And believed them as represented? A. We checked the audits over and felt that some things were high, that the inventory, for instance, was high.

"Q. How about their being approximate? A. So far as we knew they were approximately correct; there were items in there that we objected to."

In further cross-examination Mr. Clark testified that he relied upon the statement of May 31, 1928, when the plaintiff took the note in suit. On being asked if he thought the statement was true, he replied: "We took it for its face value, what it showed." He testified that in the summer of 1929 he understood that the inventories of the Piano Company were high, and, on being asked if he didn't understand that before, he replied: "Not to have any definite knowledge of it." He asked Mr. Littlefield the first of 1929 for a balance sheet of the 1928 business, but he did not receive it as Mr. Littlefield said he did not want to be to the expense of a duplication of audits; "he wanted

his statement to appear after he had completed his new financing." It fairly appears that an examination or a true audit at that time would have shown that the Piano Company was insolvent and its capital stock worthless, and that that condition continued.

The books of the Piano Company show that its sales in 1928 were $54,000 less than in 1927. Neither Mr. Clark nor any other person ever made an examination of the financial condition of the Piano Company for the plaintiff other than as it was shown by the audits and financial statements furnished by Mr. Littlefield.

Can bad faith on the part of the plaintiff in taking the note in suit be fairly inferred from the foregoing facts? If it can, the court properly submitted the question of the plaintiff's good faith to the jury. If it cannot, the motion to set the verdict aside should have been granted.

It is true, as claimed by the plaintiff, that neither gross negligence, nor knowledge of suspicious circumstances, nor failure to inquire into the consideration will of themselves, as a matter of law, prevent a recovery by a holder of negotiable paper who purchases it in the ordinary course of business; but, as is said in *Arnd* v. *Aylesworth,* 145 Iowa, 185, 123 N. W. 1000, 29 L. R. A. (N. S.) 638, cited in *Land Finance Corp.* v. *Sherwin Electric Co., supra,* 101 Vt., page 123, 141 Atl. 598, the authorities are practically unanimous in holding that the existence of such facts may, as a matter of fact, be evidence of bad faith sufficient to take the question to the jury, and especially is this so where the burden is upon the holder to establish the innocent character of his purchase.

A precise statement of the facts and circumstances, the knowledge of which will render the purchase of a negotiable instrument an act of bad faith, is not possible, as the facts vary so in the different cases, but certain principles of the law on this question have been laid down by the courts.

In *Howard Nat. Bank* v. *Wilson, supra,* 96 Vt., page 453, 120 Atl. 889, 895, this Court, citing *Paika* v. *Perry,* 225 Mass. 563, 114 N. E. 830, said: "To show knowledge that the taking would amount to bad faith it is not necessary that representatives of the bank should know the exact fraud that was practiced upon the defendant, but the defense would be available, if the facts within their knowledge tended to show there was

something wrong with the transaction. *. * * To support a verdict for the defendant there would have to be evidence of circumstances attending the taking of the note, known at the time to the representatives of the bank having to do with the taking, at least sufficient to occasion suspicion of wrongdoing.''

Bad faith may be inferred from knowledge of suspicious circumstances of a substantial character, *Hamilton* v. *Vought*, 34 N. J. Law, 187; *Valley Sav. Bank* v. *Mercer*, 97 Md. 458, 55 Atl. 435; from a wilful disregard of and refusal to ascertain the facts which are available and at hand, *Meyer* v. *Guardian Trust Co.* (C. C. A.), 296 Fed. 789, 795; from knowledge of some truth that would prevent action by commercially honest men, *Gerseta Corp.* v. *Wessex-Campbell Silk Co.* (C. C. A.), 3 Fed. (2d) 237; from wilfully shutting one's eyes when put on inquiry, *Clark* v. *Roberts*, 206 Mass. 235, 92 N. E. 461; from notice of facts which should arouse suspicion in the mind of one of ordinary business prudence, *Reliance Equipment Co.* v. *Sherman*, 216 Ala. 214, 112 So. 822. If the holder of a note had actual knowledge of suspicious circumstances, coupled with the means of readily informing himself of the facts, and he wilfully abstains from making inquiries, his intentional ignorance may amount to bad faith. *Hess* v. *Iowa Bankers' Mortg. Co.*, 198 Iowa, 1365, 201 N. W. 91.

In *Everding* v. *Toft*, 82 Ore. 1, 160 Pac. 1160, 1164, the court said: ''Even though the existence of suspicious circumstances does not necessarily spell bad faith, and negligence is not a synonym for bad faith, and failure to make inquiries does not inevitably create an irresistible force which compels a finding of bad faith, nevertheless since the ultimate inquiry is one of honesty and good faith it is competent to show the existence of suspicious circumstances, failure to make inquiries, and want of prudence, and it then becomes the province of the jury to say whether a person taking with knowledge of those facts is guilty of bad faith.''

In support of its claim of good faith in taking the note, the plaintiff depends particularly upon the reliance of Mr. Clark on the financial statement of May 31, 1928. But as he knew that the Rittenhouse audit showed a deficit of $4,246 on December 31, 1927, and a net profit of only $821.44 on net sales of over $150,000, and that the Piano Company was purchasing all of its merchandise on credit, a jury could fairly say

that he was put on inquiry as to how the Company gained a surplus of $40,000 in five months. That the statement was false is not questioned now. While Mr. Clark testified that he relied upon this statement in taking the note, he did not testify that he believed it was true, although the direct question was asked him. On the contrary, he testified that they felt that the inventory was high, although they had no "definite knowledge" of it at the time, and there were other items in the statement they objected to, but they "took it for its face value, what it showed."

The steadily increasing overdraft to a large amount after January 1, 1929, although many thousands of dollars from sources other than income were applied to reduce it, the protested checks and notes, and the fact that a financial statement was not furnished to the plaintiff by Mr. Littlefield early in 1929 when it was asked for, were suspicious circumstances which the jury could say put the plaintiff on inquiry. That the means of information were readily available and that no inquiry was made is not questioned. Mr. Clark gave explanations for all of these things. His testimony, however, is contradictory in some respects, and its credibility was for the jury. *McNight* v. *Parsons*, 136 Iowa, 390, 113 N. W. 858, 22 L. R. A. (N. S. ) 718, 125 A. S. R. 265, 15 Ann. Cas. 665; *Canajoharie Nat. Bank* v. *Diefendorf*, 123 N. Y. 191, 25 N. E. 402, 10 L. R. A. 676. It cannot be said that only an inference favorable to the plaintiff can reasonably be drawn from the evidence. There was no error in overruling the motion to set the verdict aside.

The plaintiff took one exception to the court's charge to the jury, and one to the supplemental charge. These exceptions are not briefed, and so they are not considered.

The plaintiff presented seventeen requests to charge, and excepted "in respect to the failure to comply with the respective requests, and with a separate exception to each request." Some of the requests were complied with, and some could not have been complied with. Such general exceptions are unsound, and avail nothing. *Duggan* v. *Heaphy*, 85 Vt. 515, 536, 83 Atl. 726; *In re Bean's Will*, 85 Vt. 452, 82 Atl. 734. The plaintiff has briefed only the failure to comply with its 12th request, and as it strenuously insists that it states the law controlling on the question of bad faith, we consider it.

 The request is "that neither suspicion nor defect in title in the note in question nor knowledge of circumstances that would excite suspicion in the mind of a prudent man or put him on inquiry *will affect his (plaintiff's) rights unless the circumstances or suspicions were so cogent and obvious that to remain passive would amount to bad faith.*" The italics are ours. The plaintiff places emphasis on the expression "so cogent and obvious."

The law of this request is unsound, particularly when applied to the existence of suspicious circumstances or knowledge of facts sufficient to put a prudent man on inquiry as evidence of bad faith sufficient to take the question to the jury, as the plaintiff applies it. None of the cases cited support it.

This request is based upon the text of 8 Corpus Juris 501, or cases citing it as an authority. It is there said that "mere knowledge of facts sufficient to put a prudent man on inquiry, without actual knowledge, or mere suspicion of an infirmity or defect in title, does not preclude a transferee from occupying the position of a holder in due course, unless the circumstances and suspicions are so cogent and obvious that to remain passive would (as a matter of law) amount to bad faith"; and then follows, "but the existence of such facts may be evidence of bad faith sufficient to take the question to the jury." This states the law correctly.

 During the cross-examination of Mr. Clark, the defendant introduced in evidence many checks and notes of the Piano Company that had been protested by the plaintiff as tending to show the value of its stock at the time the plaintiff took the note in suit. Some of them were received subject to the objection that the time they were protested was too remote; but this was a matter that was addressed to the discretion of the court, and it is not claimed that its discretion was abused. *Woodhouse* v. *Woodhouse*, 99 Vt. 91, 119, 130 Atl. 758. Some of the notes and checks were protested after the plaintiff took the note, and they were objected to for that reason. There seems to have been a continual protest of checks and notes after May 15, and we think that fact was admissible as tending to show the insolvency of the Piano Company on May 15. A general objection to each of the protested checks and notes was that it did not show the condition of the Piano Company at the time it was protested nor at the time the note in suit was

negotiated. It is true that the protest of one check or note might not have much evidentiary value, but taken together they had a tendency to prove the fact in question.

In redirect examination Mr. Clark was asked: "Is it anything unusual in the course of your business with a company doing the amount of business shown in the statement, to have an overdraft?" The question was excluded and the plaintiff was allowed an exception. The examiner then said: "I will ask you this—whether it is a common, universal custom among the banks in that vicinity to allow overdrafts to a company similarly situated as this was? And with the financial statements that you had?" This question was excluded and the plaintiff was allowed an exception. There was no error in excluding the questions, as the answers which were evidently expected would not have been material on any issue in the case. The evidence that the checking account of the Piano Company was "practically continually overdrawn" for three years prior to May 13, 1929, was received only on the questions of the insolvency of the Piano Company and whether the plaintiff was put on inquiry as to its financial condition.

The grand list book of the city of Barre for 1929 was offered by the defendants to show that Mr. Littlefield paid nothing but a poll tax and put in no value for his Piano Company stock. The court considered that the evidence was not admissible at that time, but received it "conditionally" so that the city clerk would not have to bring the book back again, subject to the objection and exception of the plaintiff. Later, counsel for the defendants stated that he thought the grand list was not admissible on the question of the value of the stock, and it was received only for the purpose of showing that in 1929 Mr. Littlefield paid only a poll tax, subject to the objection and exception of the plaintiff. If there was any error in receiving the grand list for that purpose, it was harmless.

The plaintiff has briefed other questions which have not been considered, as they were not raised below.

*Judgment affirmed.*

NOTE. MR. JUSTICE WILLCOX sat in the hearing of this case, but took no part in the disposition of it.